United States District Court
for the Western District of North Carolina

UNITED STATES OF AMERICA,

      Respondent.

      Civil No. 3:04CV400-2-V

      District Ct. No. 3:01CR99-01

vs.

WILLIE MCPHAUL,

      Petitioner,

===

**MEMORANDUM AND BRIEF IN SUPPORT OF PETITIONER'S
MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE
BY A PERSON IN FEDERAL CUSTODY UNDER 28 U.S.C. §2255**

===

COMES NOW undersigned counsel on behalf of Petitioner, Willie McPhaul, and respectfully submits the following information in support for a Petition for *Habeas Corpus* relief pursuant to 28 U.S.C. §2255.

I.

## COURSE OF PROCEEDINGS.

This case begins in Chicago, Illinois. To understand the full scope of the course of proceedings we must first start in Chicago in order to develop an understanding of how the Chicago case effected the North Carolina case and caused a violation of the Petitioner's due process rights under the Fifth and Sixth Amendments of the United States Constitution.

1

## A. History of Investigation in Chicago

A criminal investigation of Petitioner McPhaul began in Chicago, Illinois in or about 1996 when the FBI developed a source in Wisconsin who said that he could buy drugs from Petitioner. Petitioner, at that time, was living in Konosha, Wisconsin.

When the confidential informant contacted Petitioner to set up an undercover deal, Petitioner McPhaul put him in touch with Maurice Hood, another drug dealer who allegedly worked for Petitioner. The confidential informant subsequently set up two undercover buys from Hood, totaling 82 grams of crack cocaine. Both deals took place in Zion, Illinois where Hood was residing. FBI Agents then approached Hood in March, 1997. Hood agreed to cooperate. In his debriefings Hood alleged that he had a substantial customer base and purchased drugs from Petitioner. Hood then arranged another undercover deal with the FBI to obtain drugs from Petitioner and the success of this investigation resulted in Petitioner's arrest and subsequent cooperation.

Petitioner's cooperation was thorough and detailed, fully disclosing his conduct in the drug trade. As part of his cooperation agreement Petitioner provided FBI agents with pager and cell phone numbers of other individuals he was involved with

2

in the drug trade. Petitioner's cooperation began as early as 1999 and entailed an extensive amount of activity both in Chicago and, eventually, in North Carolina.

Petitioner began cooperating against an individual by the name of Tony, a Mexican who had been delivering large quantities of drugs into the United States, to Petitioner, for quite some time.

Petitioner was able to successfully arrange a 5 kilogram deal with Tony that was delivered to Petitioner by another individual named Herrera in the parking lot of a fast food restaurant in Chicago. Herrera was subsequently indicted and pled guilty as a direct result of Petitioner's cooperation.

During the time period Petitioner was working with the FBI to arrange an undercover deal with Tony, Petitioner was also attempting to arrange undercover deals with other crack dealers that he knew in the area. Between 1998 and 2000 Petitioner succeeded in arranging undercover drug deals with several different crack dealers in the Waukegen-Zion, IL area and one dealer in Wisconsin. In each case the police recorded conversations with these drug dealers. Based on the undercover drug deals, these individuals were indicted and eventually convicted. (Approximately 5 major drug dealers were convicted).

3

A continuing part of the Petitioner's cooperation was arranged in Illinois and Wisconsin to assist the government in tracking down a money laundering fraud case in Charlotte, North Carolina where Petitioner then resided. The subject of this investigation was a dealer of exotic cars, David Smith.

Petitioner befriended Smith after moving to North Carolina. At some time, Smith began experiencing financial difficulties. Smith tried to recruit Petitioner to distribute Ecstasy. Unbeknownst to Smith, Petitioner was cooperating with the government in Chicago. Petitioner taped conversations with Smith and eventually arranged an undercover buy. As a result of Petitioner's assistance to law enforcement agents in North Carolina he was able to recover a large quantity of Ecstasy and approximately $600,000 worth of Barrer Stock Certificates that David had purchased with his fraudulently obtained loan proceeds. The government also seized Smith's car lot, home, and large boat. After Smith was arrested, he began cooperating.

Smith began cooperating by stating that Petitioner was dealing drugs himself. Petitioner denied this accusation. Smith's statement was not unexpected as he was facing a substantial period of time in jail as a result of Petitioner's cooperation. However, no evidence could be shown that Petitioner was, in fact, dealing drugs. The only thing that became known by

4

Smith's cooperation was that Petitioner had purchased cars from Smith's business with cash left in his possession while cooperating with authorities in Chicago.

In Chicago, Petitioner pled guilty to Count 1 of a multi-count indictment for possession of controlled substance. During the course of proceedings in the Chicago case the government alleged that Petitioner had breached the plea agreement. The government conceded that between 1998 and 2000 Petitioner had arranged undercover deals with five (5) different crack dealers in Illinois and Wisconsin.

The basis for the alleged breach of plea in Chicago was that Petitioner had ongoing drug activity while cooperating and would not take a polygraph exam, a request not identified in the written Chicago Plea agreement. These allegations came in the form of David Smith and Robert Hamilton. This information was transmitted to Chicago prior to the Chicago sentencing hearing. There was, however, not enough evidence provided by the government to prove that Petitioner had breached the plea.

Allegations of unauthorized drug activity by Petitioner surfaced in early 2001 during the course of one of Petitioner's undercover meeting with North Carolina ecstasy dealer David Smith. In that undercover meeting Petitioner recorded an audio tape in which Smith referenced "one" of which Petitioner had

previously sold him. Agents confronted Petitioner about the statement after they listened to the tape. Petitioner initially claimed that he had sold an ounce of cocaine to Smith. The agents did not accept that claim and pressed Petitioner for the truth. Petitioner while under proffer protection in Chicago admitted that he had previously sold a kilogram of cocaine to Smith. It was alleged Petitioner distributed the kilogram of cocaine without the knowledge or consent of the government at the time he was supposed to be cooperating. The government, having found out about this through Petitioner's admissions, and unable to corroborate this information, allowed Petitioner to continue his cooperation and not be charged with additional offenses in breach of his plea agreement. Petitioner maintained, however, that this was an isolated transaction and that he had not sold drugs at other times during the period of his cooperation with the government. The government gave Petitioner the benefit of the doubt and allowed him to continue to cooperate.

In Chicago, Petitioner pled guilty to the undercover sale that led to the government's initial interest in him and his subsequent cooperation. Petitioner was sentenced to 146 months incarceration in Chicago.

North Carolina knew about the cooperation that Chicago had initiated in North Carolina. The problem with the indictment in North Carolina is that it is based upon cooperation and information that Chicago knew about and permitted Petitioner to continue to do.

## The Chicago Time Line

1. On January 23, 1997 the FBI named Petitioner in a criminal complaint. The complaint charged that on or about March 9, 1997, Petitioner knowingly and intentionally distributed and possessed with intent to distribute a mixture or substance containing cocaine base in violation of 21 U.S.C. 841(a)(1).

2. The January 23, 1997 complaint was filed with the hope that Petitioner would cooperate. At that point, Petitioner had moved to North Carolina and, when located in February 1998, he self-surrendered and agreed to cooperate. He began his cooperation in Chicago in February 1998 and gave lengthy proffers concerning his involvement in the drug trade. Included in his Chicago proffer was information concerning Smith in North Carolina.

3. On November 8, 2001 Petitioner and co-defendant Hamilton were named in a 1 count indictment filed by the special

7

May 2001 grand jury. This indictment charged that on or about March 9, 1997 in Waukegen, the defendant and co-defendant Hamilton, knowingly and intentionally distributed a controlled substance, namely approximately 252.9 grams of a mixture containing cocaine base in violation of 21 U.S.C. 841(a)(1).

4. On January 11, 2002 Petitioner entered a plea of guilty of Count 1 of the indictment in Chicago.

5. On January 24, 2003 Petitioner was sentenced to 146 months in custody as a result of the sentence imposed after credit for cooperation.

## B. History of Investigation in North Carolina

It should be noted that the North Carolina cooperation against Smith began in Illinois.

David Smith was under investigation by the Chicago United States Attorney's Office. The North Carolina IRS became aware that Petitioner was cooperating with the FBI in the Northern District of Illinois. Petitioner agreed to continue to cooperate with the North Carolina authorities regarding David Smith.

On May 14, 2001 at approximately 4:20 p.m. a Use Immunity letter was faxed to Petitioner's attorney Steve Muslin, who also represented Petitioner in Chicago. On May 16, 2001 a plea

Case 3:04-cv-00400-RLV   Document 1   Filed 08/16/04   Page 8 of 56

agreement in North Carolina was reached and executed between the United States and the Petitioner.

Pursuant to the Use Immunity Letter Petitioner was wired and made various phone calls to purchase Ecstasy from David Smith. The result of this undercover operation was that David Smith was arrested.

Petitioner entered a plea to money laundering charges in North Carolina that he should not have pled guilty to but for Counsel's ineffective assistance. Of significance is that the cooperation concerning David Smith on the IRS matter, with the North Carolina authorities, started in Chicago in 2001. Petitioner was not sentenced in Chicago until 2003. Petitioner was sentenced in North Carolina, on money laundering charges, on August 19, 2003.

Petitioner should not have been charged with any crimes in North Carolina as his cooperation had already begun with David Smith through his Chicago efforts. More importantly Petitioner, when asked, revealed information concerning any activities he had with David Smith unrelated to the reason that he was cooperating against David Smith. The Assistant United States Attorney in Chicago allowed North Carolina to charge Petitioner even though he knew Petitioner was under a cooperation agreement. David Smith was already a target from Illinois. The

9

two jurisdictions of Chicago and North Carolina did not work together and made Petitioner the tennis ball between their intentions concerning David Smith.

C.  **North Carolina Money Laundering Charges**

The charges against Petitioner in North Carolina were conspiracy to commit money laundering in violation of 18 U.S.C. 1956(h). The money laundering charges identify that Petitioner on several occasions, starting in 1999, (this timeline is the beginning of Petitioner's cooperation in Chicago) purchased automobiles from David Smith's import auto dealership in Charlotte, North Carolina. Petitioner purchased seven vehicles from Southern Imports, each time trading in a previously owned vehicle.

The IRS alleged that Petitioner was required to file an 8300 form for cash transactions over $10,000. The IRS also claimed Petitioner used nominees in order to hide the source of the funds used to buy the vehicles. The government alleged that there were 7 different vehicles purchased by Petitioner in an attempt to avoid reporting requirements.

An evaluation of these seven vehicles reveals that, on each vehicle purchased, there was a trade-in value and Petitioner paid a difference usually showing he lost money on the trade-in. The cash value of each of these vehicles, in terms of the

10

difference paid, were sometimes less than $10,000 but on one occasion was $10,000 in cash.

Form 8300 requires the <u>receiver</u> of the cash transaction to file the 8300 form. The person giving the money for the service is not required to file the form. Petitioner could not violate the 8300 form requirements.

The funds used for purchasing these vehicles were funds Petitioner had while cooperating in Chicago. These funds were never asked for by the Chicago authorities, and were monies that the Chicago authorities knew he had. At the time these vehicles were being purchased, Petitioner was acting in an undercover capacity with Chicago, working on setting up David Smith in North Carolina.

Notwithstanding the question of whether or not Petitioner should have been charged with the aforementioned offenses at all is the question of why any new charges in North Carolina were not transferred to Chicago and addressed in that court in light of the cross jurisdictional issue that had developed with Petitioner's cooperation against David Smith. Counsel was ineffective for allowing Petitioner to enter a plea in North Carolina to any new charges beyond the Chicago case.

D.    **The North Carolina Plea**

11

The North Carolina plea agreement states that "the Petitioner knew or believed the funds were the proceeds of unlawful activity involved in the manufacture, importation or distribution of narcotics or controlled substance" and that with respect to Count 1, the value of the funds involved $200,000 but less than $350,000. (**Exhibit A**)

Petitioner states that these were from the Chicago activity and no government agent requested that he forfeit same. This is particularly noteworthy in light of the fact that Petitioner was paying for his own transportation to and from Chicago during the course of his four plus (4+) years of cooperation. This is further supported by the fact that when Petitioner was in the Amtrak train station in Chicago, on one of his cooperation visits, agents at the station confiscated $5,000 in cash from him. The agent working with him at the time, Mike Biegalski, actually got the $5,000 in cash back from the agent and returned it to the Petitioner. Thus, the government knew that Petitioner had large sums of cash on him at all times and would use that money to help offset the costs to the government to visit for cooperation purposes and other expenses. Therefore, any transactions with the automobiles in North Carolina were known or should have been known in light of the fact that Petitioner was able to keep large sums of money from his drug trafficking.

12

(Petitioner's charges in Chicago never had a forfeiture count or charge). This is further supported by the fact that, after Petitioner was indicted in North Carolina, the government in North Carolina requested the forfeiture of any additional cash assets, something that Chicago chose not to do. North Carolina created new charges on Chicago's knowledge of Petitioner's cash assets. This manipulated Petitioner into an invalid plea as Petitioner was making purchases with money that the authorities in Chicago knew he kept. Anyone in a similar position would have inferred that it was okay to keep the cash from drug proceeds.

The government's willful blindness in Chicago to Petitioner's retention of funds from drug proceeds estops the government from charging Petitioner with laundering funds in North Carolina.

As such, Petitioner would be placed in a catch-22 position of retaining those funds while cooperating in Chicago, using those funds to live off of and travel while living in North Carolina and the same funds subjecting him to additional criminal charges. The Federal Government is one government, the Petitioner should not be held accountable in two jurisdictions for matters dealing with one case.

E.    <u>Charging Documents in North Carolina</u>

13

In the Presentence Investigation Report, the offense conduct discusses, as part of the theory of money laundering, Petitioner's failure to file an 8300 form. The 8300 Form General Instructions state:

> "each person engaged in a trade or business who, in the course of the trade or business, <u>receives</u> more than $10,000 in cash in one transaction, or in two or more related transactions, must file Form 8300." (emphasis added).

On the Bill of Information the charge presented was Conspiracy to Money Launder in violation of 18 U.S.C. 1956(h). The Bill of Information stated that the charge was a violation of 1956(a)(1). During the plea colloquy the Bill of Information had in its content violation of section (a)(1)(B)(1). The Court noted that the violation should be (a)(1)(A)(1). As such, the indictment was amended at the plea colloquy to incorporate the appropriate subsection of 1956. The difference in the language of those two sections was not read in open court nor did Petitioner have the opportunity to understand which of the two he was pleading guilty to (Plea Transcript page 12-13).

The elements of the charged Money Laundering offense are: (1) knowingly conducting or attempting to conduct a financial

14

transaction; (2) knowing that the property involved in the financial transaction represents the proceeds of some form of unlawful activity; (3) the property involved in the financial transaction in fact involves the proceeds of a specified unlawful activity; and (4) engaging in a financial transaction with the intent to promote the carry on of the specified unlawful activity. All four elements of the offense could not be met in light of Petitioner's cooperation and the engagement of that cooperation starting in Chicago regarding David Smith as well as Chicago not seeking forfeiture of any drug proceeds and knowing Petitioner had access to and maintained large sums of cash. Charges should never have been brought in North Carolina at all and, therefore, the Petitioner did not enter a knowing and intelligent plea.

What is of concern to Petitioner is that everyone knew that he had proceeds from his illegal drug trafficking trade. This would be a logical conclusion from the drug trafficking that he was involved in and revealed during his cooperation proffers (See pages 13-14 of the Plea Agreement).

Finally, Petitioner was sentenced in North Carolina on August 19, 2003. The sentence imposed in the North Carolina case was a term of imprisonment of 84 months. This sentence was to run concurrent with the sentence imposed in Chicago.

## Issue I

**PETITIONER COULD NOT HAVE ENTERED A KNOWING AND INTELLIGENT PLEA IN NORTH CAROLINA AND COUNSEL WAS INEFFECTIVE FOR ALLOWING HIM TO DO SO.**

Petitioner could not have entered a knowing and intelligent plea in light of the fact that North Carolina knew, or should have known, that Chicago had already been informed of Petitioner's conduct with David Smith. In fact, the cooperation against David Smith began in Chicago. North Carolina also knew, or should have known, as Chicago knew, that Petitioner was in possession of large sums of cash and was using this to take care of himself and his expenses to continue his cooperation in Chicago and North Carolina. The government in Chicago did not provide any expenses and, therefore, Petitioner was required to use his own funds.

Petitioner received a <u>proffer letter</u> of March 11, 1998 concerning his cooperation with the authorities in Chicago, Illinois. He purchased the cars in North Carolina starting in 1999.

There is no basis for a money laundering charge in North Carolina and Petitioner could not have entered a knowing and intelligent plea in light of the fact that there were no factors that supported the elements of the offense and the charges were

16

based on known information. Additionally, the charges were amended at the plea hearing without notice or clarification to Petitioner.

Petitioner engaged in auto transactions with the government having full knowledge that Petitioner possessed large sums of cash derived from criminal activity. Therefore, the North Carolina authorities cannot use Chicago's mistakes to charge Petitioner with an offense he could not have been guilty of but for the fact that the government allowed him to proceed accordingly in maintaining possession of the cash from pre-cooperation drug activity.

The cash that Petitioner used to purchase vehicles was not all valued at greater than $10,000.00. By the government allowing Petitioner to use drug proceeds for living expenses and transportation for cooperation purposes they are estopped from suggesting he laundered funds by purchasing vehicles with the same funds that the government knew he had. Since the elements of the offense cannot be met and the government is estopped from charging the Petitioner with money laundering, the plea could not have been knowing and intelligently made and counsel was ineffective in allowing said plea to be entered in North Carolina.

17

The elements of money laundering could not be met. Petitioner could not have intended action to promote the crime if he was using funds he was allowed to keep. Nothing he did promoted the illegal activities he already confessed to in proffers and was no longer involved with. There could be no willful or knowing conduct to promote an illegal activity that no longer existed. (See 18 U.S.C. 1956(a)(1)(A)(1)).

Counsel Muslin created a conflict of interest between Chicago and North Carolina that resulted in a second conviction that the government was estopped from pursuing based on protected proffers and Chicago's willful blindness to Petitioner's cash assets.

The importance of determining whether a defendant made a knowing and intelligent acceptance of the plea cannot be underscored. A plea of guilty involves the waiver of certain constitutional and statutory rights. *See* United States v. DeSantiago-Martinez, 980 F.2d 582 (9th Cir. 1992); United States v. Wessells, 936 F.2d 165 (4th Cir. 1990); United States v. Navarro-Botello, 912 F.2d 318 (9th Cir. 1990). The Ninth Circuit Court of Appeals, in DeSantiago-Martinez, articulated the importance of this point in stating that, *"it is incumbent upon the judge to canvass the defendant in a manner that ensures that the defendant made a voluntary decision based on an*

18

*understanding of both the nature of the charges against him and the statutory and constitutional rights he is relinquishing."* DeSantiago-Martinez, 980 F.2d at 583, citing McCarthy v. United States, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969).

Once a plea is accepted, the Federal Rules of Criminal Procedure allow a defendant to withdraw the plea with the court's permission for valid grounds to do so. See United States v. Rohas, 898 F.2d 40, 42-43 (5th Cir. 1990).

A defendant may challenge a guilty plea on the grounds of ineffective assistance of counsel preventing the defendant from entering a knowing and voluntary plea. *See* Hill v. Lockhart, 474 U.S. 52 (1985); Boykin v. Alabama, 395 U.S. 238, 243-44 (1969); and United States v. Mims, 928 F.2d 310, 312 (9th Cir. 1991) (substantial weight attached to statements on records in assessing voluntariness of pleas). A guilty plea is valid only if voluntarily and intelligently made "with sufficient awareness of the relevant circumstances and likely consequences." *See* Brady v. United States, 397 U.S. 742, 748 (1970); *accord* North Carolina v. Alford, 400 U.S. 25, 31 (1970). A plea of guilty must "represent a voluntary and intelligent choice among the alternative courses of action open to the defendant." *See* American Bar Association, Standards for Criminal Justice 4-5.2(a)(i) (2d Edition 1980). A plea cannot be voluntary and/or

19

intelligent if the advice given by counsel, upon which the defendant, to his detriment, relied upon. *See* Hill v. Lockhart, 474 U.S. 52 (1985).

*See* Tollett v. Henderson, 411 U.S. 258, 263 (1973). The entering of a plea of guilty waves many constitutional rights (*e.g.* the privilege against self-incrimination, the right to confrontation and cross-examination of witnesses, and the right to a public and jury trial, etc.), including the right to prosecute/litigate defendant's degree of culpability which ultimately, due to the Sentencing Reform Act of 1984, and the United States Sentencing Guidelines effective November 1987, may result in dire consequences due to the sentencing guideline system which assesses punishment of months of imprisonment based upon the relevant conduct product under the provisions of U.S.S.G. 1B1.3. *Also see* FRCrP Rule 11(e)(2), United States v. Ewing, 957 F.2d 115, 118-19 (4th Cir.), *cert. denied*, 112 S.Ct. 308 (1992); United States v. Kemper, 908 F.2d 33, 36-37 (6th Cir. 1990).

A criminal defendant may assert an entrapment by estoppel defense when the government affirmatively assures him that certain conduct is lawful, the defendant thereafter engages in the conduct in reasonable reliance on those assurances, and a criminal prosecution based on the conduct ensues. *See*. United

States v. Aquino-Chacon, 109 F.3d 936, 938 (4th Cir 1997). The government misled Petitioner into believing that he could keep cash funds and spend them as he saw fit. Chicago never asked for any cash assets from the illegal drug trafficking trade Petitioner was involved in and proffered about during his cooperation. The government, in fact, gave money back to Petitioner that was confiscated from Petitioner by other agents at the train station in Chicago, further reinforcing Petitioner's reliance that his use of cash to purchase personal items would not cause him to be charged criminally.

Based on the fact that the government in Chicago was aware of Petitioner's financial situation, they are estopped from prosecuting Petitioner further in North Carolina. The question of any possessory interest in illegal funds from the drug trade was already known by the government in Chicago, the same government that has jurisdiction over North Carolina.

The issue of Petitioner's possession of sums of cash from his illegal drug trade was decided when the agent in Chicago gave him back the previously confiscated $5000.00. It is also information that was known, or should have been known, in light of the fact that Petitioner used his own funds to travel to and from Chicago in order to continue his cooperation over an extended period of time. Therefore, the issue in North Carolina

21

that resulted in new criminal charges is the same, identical, issue that was previously addressed by inference of the government's conduct in Chicago. The government in Chicago had full and fair opportunity to litigate any financial issues relating to Petitioner's retention of large sums of cash from his drug trafficking. They chose not to do so. North Carolina cannot be used as a back door through which to obtain new criminal charges on something that was resolved by acquiescence, willful blindness, or actual conduct. *See* generally United States v. McClung, 1997 U.S. Dist. LEXIS 16469 (W.D. Va. Sept. 23, 1997) citing to United States v. Fiel, 35 F.3d 997 (4th Cir. 1994) cert. denied 513 U.S. 177, 115 S.Ct. (1994) and Sandberg v. Virginia Bankshares, Inc., 979 F.2d 332 (4th Cir. 1992).

As asserted herein, Petitioner's counsel was ineffective for failing to assert an estoppel or willful blindness defense before allowing Petitioner to enter a plea in North Carolina. *See* Chacon, *supra*. Therefore, Petitioner could not have entered a knowing and intelligent plea to the charges in light of the fact that the charges should have been collaterally estopped by the acquiescence in Chicago and/or that Petitioner was entrapped in North Carolina by estoppel and new charges were filed that should not have been. The circumstances in this case are not vague or contradictory, but rather clear and convincing and such

22

that a reasonable person would have acted in accordance with Petitioner's conduct. By agents allowing Petitioner to retain funds from his illegal drug trafficking and giving these funds back to Petitioner after they were confiscated at the train station in Chicago, Petitioner was clearly informed that he would not be charged with any additional crimes as a result of his retention and expenditure of drug proceeds. The inconsistent positions of both Chicago and North Carolina clearly estops North Carolina from charging Petitioner for something he was innocent of. Petitioner entitled to withdraw his plea in North Carolina and all charges should be dismissed.

Petitioner's conduct did not amount to a new crime and, therefore, Petitioner could not have entered a plea of guilty to said charges in North Carolina and counsel was ineffective in allowing Petitioner to plead guilty to any new charges. Petitioner has clearly shown the government is estopped from charging additional crimes in North Carolina and counsel was ineffective in allowing him to do so. Fields v. Attorney General of MD, 956 F2d 1290, 1297-99 (4th Cir. 1992).

## Issue II

**COUNSEL WAS INEFFECTIVE FOR FAILING TO CHALLENGE THE SENTENCING GUIDELINES AS APPLICABLE TO THE AMOUNT OF FUNDS PLED TO AS THE LOSS VALUE FOR THE MONEY LAUNDERING CHARGE.**

This issue only has effect if the court will not allow Petitioner to withdraw his plea. However, Petitioner should be permitted to have his plea withdrawn due to the totality of the circumstances presented and the fact that no crime could have been committed.

In an effort to secure the record for post-conviction relief, the following should also be considered.

According to the Presentence Report of paragraph 24 since defendant knew the laundered funds were the proceeds of an offense involving the manufacture, importation, and distribution of a controlled substance the offense level is increased by (6) pursuant to U.S.S.G. 2S1.1(b)(1). This was later reduced to an additional (3) points, however, these (3) points are an element of the offense that must be determined by the jury and, in fact, could be double counting in light of the fact that the actual charges incorporate the same elements of the offense. Petitioner could not be enhanced on these three (3) points based on evidence of Chicago's misconduct in allowing Petitioner to keep drug proceeds. This enhancement is an ex post facto penalty

24

estopped by government misconduct. Petitioner could not have known anything else about the funds and is innocent of this three (3) point assessment.

In addition, Petitioner was charged 18 U.S.C. 1956 resulting in a 2 level increase for 2S1.1(b)(2)(b). Again, this is an element of the offense. Additional application of this sentencing guideline is double counting as an element of the offense and must be determined by the jury. See <u>Blakely v. Washington</u> 2004 U.S. LEXIS 4573; 524 U.S. _____ (2004).

Since the aforementioned elements are the same as the offense conduct alleged in the Bill of Information they cannot be recharged and used to increase the sentence and deprive the Petitioner of his liberty without due process of law. As such, counsel was ineffective in not challenging this application.

The Supreme Court, in *Blakely*, announced a new rule of constitutional procedural law that fits into an exception to the *Teague* bar, and the Court also announced a new rule of constitutional substantive law, which is automatically retroactive. (See <u>Teague v. Lane</u> 489 US 288, 109 S.Lt. 1060 (1989)). This conclusion is based on the undisputed fact that *Blakely* requires proof beyond a reasonable doubt of any fact, except a prior conviction, which increases the penalty for a crime.

"*In order to justify the failure to raise on issue during trial and direct appeal based on a subsequent change of law, the state of the law must have been such that the legal basis for the claim was not reasonably available when the matter should have been raised.*" United States v. Mikalajunas, 186 F.3d 490, 493 (4th Cir. 1999), *cert. denied*, 146 L.Ed.2d 230, 120 S.Ct. 1283 (2000). See also Evans v. Smith, 220 F.3d 306, 323 (4th Cir. 2000) (The federal habeas statute "affords an opportunity to bring new claims where the petitioner can show that he was not at fault for failing to raise those claims previously and where the claims, if meritorious, would sufficiently undermine confidence n the judgment at issue"); United States v. Pitt, 953 F.Supp. 737, 739 (W.D. Va. 1997) ("Defendant has shown adequate cause for his failure to raise this issue at trial, sentencing, or direct appeal, because Bailey was decided after his appeal"), *aff'd*, 131 F.3d 138 (table), 1997 WL 727585 (4th Cir. 1997), *cert. denied*, 523 U.S. 1053 (1998).

## Issue III

**TRIAL COUNSEL, WHO REMAINED ON THE CASE FOR APPELLATE REVIEW, WAS INEFFECTIVE FOR FAILING TO ADDRESS THESE MATTERS AT THE DISTRICT COURT AND/OR TO APPEAL SAME.**

Petitioner's counsel was ineffective in failing to perfect an appeal in North Carolina. Trial counsel advised the Defendant

26

not to pursue an appeal but failed to notify the Defendant that there was a potential conflict of interest because he had failed to protect Petitioner's rights under the Agreement with the government in Chicago. Counsel never advised the Defendant that he had the right to raise ineffective assistance of trial counsel.

The requirement that a defendant receive effective assistance of counsel is constitutionally mandated. U.S. Const. Amend VI; Reece v. Georgia, 350 U.S. 85, 90, (1955) (the effective assistance of counsel...is a constitutional requirement of due process of law); McMann v. Richardson, 397 U.S. 759, 771 & n.14, 25 L.Ed.2d 763, 90 S.Ct. 1441 (1970) (the right to counsel is the right to effective assistance of counsel). The text of the Sixth Amendment itself suggests as much. The Amendment requires not merely the provision of counsel to the accused, but "assistance," which is to be "for his defense." In some cases the performance of counsel is so inadequate that, in effect, no assistance of counsel is provided. Clearly in such cases, the defendant's Sixth Amendment right to have assistance of counsel is denied. United States v. Decoster, 624 F.2d 196, 219, cert. denied, 444 U.S. 944, 62 L.Ed.2d 311, 10 S.Ct. 302 (1979).

27

The substance of the Constitution's guarantee of the effective assistance of counsel is illuminated by reference to its underlying purpose. The Supreme Court has consistently adhered to Justice Sutherland's observation in Powell v. Alabama, 287 U.S. 45, 71, 53 S.Ct. 55, 77 L.Ed.158 (1932), that when assistance of counsel is required, that assistance must be "effective" rather than pro forma. See Evitts v. Lucey, 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985); Strickland v. Washington, 466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct. 2052 (1984); Wainwright v. Torna, 455 U.S. 586 (1982) (per curiam).

Unless a defendant charged with a serious offense has counsel able to invoke the procedural and substantive safeguards that distinguish our system of justice, a serious risk of injustice infects the trial itself. Cuyler v. Sullivan, 446 U.S. 335, 343, 64 L.Ed.2d 333, 100 S.Ct. 1708 (1980). For that reason, the Supreme Court has held squarely that the right to counsel guaranteed by the Constitution is a right to the "effective assistance of counsel." See United States v. Cronic, 466 U.S. 648, 654, 80 L.Ed.2d 657, 104 S.Ct. 2039 (1984). Absent competent counsel, ready and able to subject the prosecution's case to the "crucible of meaningful adversarial testing," there can be no guarantee that the adversarial system will function properly to produce just and reliable results.

28

*Cronic*, *Id.*, 466 U.S. at 656.  See *Strickland*, *supra*, 466 U.S. at 684-687.

The Supreme Court has described the prejudice element as follows: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. 668, 694.

Respectfully submitted this 13th day of August 2004,

Charles L. Morgan, Jr. (NP)
101 N. McDowell Street
Suite 200
Charlotte, NC  28204

Marcia G. Shein, Esquire
*Law Office of Marcia G. Shein, P.C.*
1945 Mason Mill Road
Suite 200
Decatur, GA  30033
(404) 633-3797
(404) 633-7980 (Fax)

Case 3:04-cv-00400-RLV   Document 1   Filed 08/16/04   Page 29 of 56

## CERTIFICATE OF SERVICE

I hereby certify that I have this date mailed a copy of the foregoing to:

D. Scott Broyles
AUSA
227 West Trade Street, Suite 1700
Charlotte, NC 28202

H. Thomas Church
AUSA
227 West Trade Street, Suite 1700
Charlotte, NC 28202

by depositing a copy of same in the United States Postal Service with adequate postage affixed thereon to ensure its delivery.

This _13th_ day of _August_, 2004.

Respectfully submitted,

_Charles Morgan_ (wp)

Charles L. Morgan, Jr.
101 N. McDowell Street
Suite 200
Charlotte, NC  28204

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. |
| | ) | |
| v. | ) | |
| | ) | **PLEA AGREEMENT** |
| (1) WILLIAM McPHAUL | ) | |
| | ) | |

NOW COME the United States of America, by and through Robert J. Conrad, Jr., United States Attorney for the Western District of North Carolina, and the defendant, WILLIAM McPHAUL, in person and through counsel, STEVEN MUSLIN, and respectfully inform the Court that they have reached the following agreement:

## I. Plea

1.     The defendant agrees to enter a voluntary plea of guilty to Count One as set forth in the Bill of Information, and admits to being in fact guilty as charged in that Count.

## II. Sentence

2.     The defendant is aware that the statutory minimum and maximum sentences for each Count is as follows:

<u>Count One:</u>    a $500,000 fine or twice the value of the property involved in the transaction, whichever is greater, and not more than 20 years imprisonment, or both.

The defendant is aware that any sentence imposed will be in conformity with the *United States Sentencing Guidelines* [*U.S.S.G.*], and that a sentence imposed under the Guidelines is without parole. The defendant is further aware that the Court has not yet determined the sentence, that any estimate from any source, including defense counsel, of the likely sentence is a prediction rather than a promise, and that the Court has the final discretion to impose any sentence up to the statutory maximum. The defendant further understands that no recommendations or agreements by the United States are binding upon the Court.


EXHIBIT
A
Blumberg No. 5119

3.     In regard to the Sentencing Guidelines, the defendant and the United States agree to recommend to the Court as follows:

    a.     The defendant knew or believed that the funds were the proceeds of an unlawful activity involving the manufacture, importation, or distribution of narcotics or other controlled substances;

    b.     With respect to Count One, the value of the funds involved were more than $200,000 but less than $350,000.

    c.     Provided that the defendant acknowledges to the government, the Probation Office, and the Court the nature and extent of all relevant criminal conduct, the United States agrees to recommend a two-level reduction in offense level pursuant to *U.S.S.G.* § 3E1.1.

        Provided that the defendant has timely provided information to the government concerning his involvement in the offense(s) charged, or has timely notified authorities of an intention to plead guilty, the United States agrees to recommend that the defendant receive an additional one-level reduction pursuant to *U.S.S.G.* § 3E1.1(b)(2).

        However, the defendant understands that any reduction in offense level is ultimately for the Court's determination.

    d.     Notwithstanding any recommendations in this Agreement as to the offense level, if the Probation Office determines from the defendant's criminal history that *U.S.S.G.* §4B1.1 (Career Offender) or §4B1.4 (Armed Career Criminal) or a statutory minimum sentence applies, then that provision will be used in determining the sentence.

    e.     The defendant is aware that if the Probation Office determines that a different offense level or a Guideline not addressed in this agreement applies, and the Court finds that the Probation Office is correct, then the Court will use that offense level or Guideline in determining the sentence. Nothing in this Plea Agreement will prevent either the United States or the defendant from arguing, before the sentence is imposed, for the offense level as agreed upon herein and a sentence within the corresponding *U.S.S.G.* range.

4. The United States and the defendant agree, pursuant to Federal Rule of Criminal Procedure 11(e)(1)(B), that the defendant's sentence, including any fine, will be within the applicable Sentencing Guidelines range, and that the Court in its discretion will determine the exact point within that range. Nothing in this Agreement precludes the defendant from arguing for or otherwise seeking to obtain either a specific form or term of sentence as permitted within such range or, if applicable, a sentence authorized by *U.S.S.G.* § 5B1.1 or 5C1.1. Nor does this Agreement require or prohibit that the United States take a position before the Court concerning the specific form or term of the sentence within the applicable range or *U.S.S.G.* § 5B1.1 or § 5C1.1.

5. Subject to the Court's discretion and determination that the defendant is financially able, the defendant agrees to pay full restitution, which will be included in the Court's Order of Judgment. The defendant agrees that such restitution will include all victims directly or indirectly harmed by the defendant's relevant conduct, as defined by *U.S.S.G.* §1B1.3, regardless of whether such conduct constitutes an "offense" under 18 U.S.C. § 3663.

In the event that the United States has agreed hereunder to dismiss one or more counts, the defendant agrees to pay restitution for all losses resulting from the activities underlying and relevant to the dismissed counts, regardless of whether any such charge is an "offense" for purposes of 18 U.S.C. § 3663 or any other applicable statute.

The parties further agree that the Court may accept the information in the Presentence Investigation Report, except any facts to which the defendant files written objections, as establishing sufficient factual findings regarding the amount of loss sustained by the victim, the financial resources of the defendant, earning ability of the defendant, and any other factors contained in said report [18 U.S.C. §3664(a) & (b)].

6. The parties stipulate that, pursuant to 21 U.S.C. § 862(a), the defendant will be ineligible for all federal benefits for 5 years after the date of sentencing. If the Court determines that this conviction is the second federal or state offense of distribution of controlled substances, the defendant will be ineligible for all federal benefits for 10 years after sentencing. If the Court determines that this conviction is the third or subsequent such offense, the defendant will be permanently ineligible for all federal benefits.

7. The defendant hereby agrees to pay the total amount required for assessment $100.00 per count, to the Clerk, United States District Court, before 5:00 p.m. on the date of pleading guilty.

8. The defendant agrees to reimburse the United States for the cost of Court-appointed counsel and that the Court may include such reimbursement in the Order of Judgment.

## III. Procedure

9. The defendant agrees that a duly-qualified federal Magistrate Judge may conduct the hearing required by Federal Rule of Criminal Procedure 11.

10. In regard to the factual basis as required by Federal Rule of Criminal Procedure 11(f):

    a. With the Court's permission, the factual basis will be deferred until the time of sentencing.

    b. The parties stipulate that the Court may use the offense conduct set out in the Pre-Sentence Report, except any facts to which the defendant has objected, to establish a factual basis for the defendant's plea.

    c. The defendant stipulates that there is a factual basis for the plea of guilty, and relieves the United States of any further obligation to present evidence. The United States may provide the factual basis for this case by presenting witnesses, relying upon the Pre-Sentence Report, or reciting for the Court a summary of the investigation.

    d. The United States may present pertinent background information and evidence obtained during the investigation of the matters described in the Bill of Information. The United States will correct misleading or inaccurate statements or information, if any, that the defendant or other persons may present to the Court.

16.    The defendant waives any and all challenges to his/her indictment based on <u>Jones v. United States</u>, 526 U.S. 227 (1999), <u>Richardson v. United States</u>, 119 S.Ct. 1707 (1999), and <u>Apprendi v. New Jersey</u>, 2000 WL 807189 (June 26, 2000).

17.    The defendant waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. §552, or the Privacy Act of 1974, 5 U.S.C. §552a.

18.    The defendant forfeits and otherwise waives any ownership right in all items seized during the investigation of the acts alleged in the Bill of Information including but not limited to a 2002 Cadillac Escalade and a Mercedes S500.  The Court has jurisdiction over the disposition of such items and may order the investigative agency to dispose of the items in such manner as provided by the agency's regulations. Forfeited firearms will be ordered destroyed.

## V.  Assistance to Government

19.    If requested by the United States, but only if so requested, the defendant agrees to cooperate with the United States, including but not limited to the following:

a.    The defendant will provide truthful information about the subject charges and about any other criminal activity within the defendant's knowledge to any government agent or agency that the United States designates.

b.    The defendant will testify truthfully in any trial, hearing, or grand jury proceeding, including but not limited to testimony against any co-defendants, as the United States designates.

c.    The defendant will truthfully disclose all monies, negotiable instruments, securities, or other things of value furnished or intended to be furnished by or to the defendant in exchange for a controlled substance in violation of state or federal law, and all proceeds traceable to such exchanges, and all monies, negotiable instruments, securities, or other things of value used or intended to be used to facilitate a violation of state or federal law.  The defendant further agrees to voluntarily forfeit said property to the United States.

d.  In the event that the defendant's cooperation includes testifying, the defendant hereby waives payment of any witness fees or expenses to which he may otherwise be entitled pursuant to 28 U.S.C. § 1821.

e.  The information that defendant provides may be verified by polygraph or any other method that the United States chooses. If the defendant undergoes a polygraph examination and, in the opinion of the examiner, the defendant's answers indicate deception, then the United States may declare the plea agreement null and void, except that the defendant's guilty plea and the resulting guilty verdict will stand.

f.  The defendant understands that the United States desires only truthful and accurate information and testimony and, in fact, that knowingly giving false information or testimony can be prosecuted as an additional criminal offense.

Further, if the defendant knowingly gives false testimony, the Plea Agreement will become null and void, except that the defendant's plea of guilty and the resulting guilty verdict will stand.

g.  The defendant will not violate any federal, state or local law, or any order of any court including any conditions of pretrial, pre-sentence, or post-sentence release.

h.  Nothing that the defendant discloses pursuant to this Plea Agreement will be used against him in any other criminal proceeding, subject to the following exceptions:

(1)  the United States or other jurisdiction may use any and all relevant information regarding crimes of violence;

(2)  the United States may use any and all information as necessary in a prosecution for perjury, or in any trial for impeachment or rebuttal;

(3)  if the defendant withdraws his plea of guilty, the United States may use any and all information in any subsequent trials or criminal proceedings;

        (4)    if the defendant violates any of the terms of this plea agreement, including the obligation to provide truthful information, then the United States may use any and all disclosures in subsequent trials or other court proceedings; and

        (5)    the United States may make indirect use of any information that the defendant provides, including investigative leads or other witnesses.

i.    The defendant's obligation under this section is a continuing one, and will continue after sentencing until all investigations and/or prosecutions to which the defendant's cooperation may be relevant have been completed. This provision is a material condition of this plea agreement and all benefits that accrue to the defendant pursuant to this agreement.

In the interests of meeting all obligations under this section, the defendant agrees to waive all rights under Chapters 213 and 208 of Title 18 until such time as the United States determines that all relevant investigations and/or prosecutions have been completed.

j.    The defendant fully understands that any breach of this agreement, including but not limited to withholding information, misleading the United States or any law enforcement officer, or failing to testify truthfully at any trial, grand jury, or other judicial proceeding, will allow the government, in its sole discretion, to declare the plea agreement to be null and void. In such event, the United States will be free to proceed on any properly-filed pending, superseding, or additional charges, including any charges dismissed pursuant to this agreement.

20.    When and if the defendant assists the government as described above:

a.    The United States, in its sole discretion, will determine whether said assistance has been substantial.

b.    Upon a determination that the defendant has rendered substantial assistance, the government may make a motion pursuant to *U.S.S.G.* §5K1.1 for imposition of a sentence below the applicable Sentencing Guidelines. The United States also may, within its sole discretion, move the Court pursuant to 18 U.S.C. § 3553(e) to impose a sentence below any applicable statutory mandatory minimum.

The defendant recognizes that the Court cannot depart below the Sentencing Guidelines for substantial assistance [*U.S.S.G.* § 5K1.1] absent a motion from the United States. The defendant further recognizes that, even if the United States makes a recommendation pursuant to §5K1.1, the Court cannot depart below the statutory minimum unless the United States also includes a specific recommendation pursuant to 18 U.S.C. § 3553(e).

c. Regardless of the nature and extent of any substantial assistance that the defendant renders, the United States will not move for a downward departure if the defendant also knowingly furnishes information that is materially false.

d. Any determination that the defendant has failed to provide substantial assistance or has knowingly provided false information is within the sole discretion of the United States, and the defendant waives all objections and rights of appeal or collateral attack of such a determination.

e. The defendant understands that if the United States makes a motion for downward departure, the motion is not binding on the District Court. The Court will determine in its discretion whether to grant or deny such departure, and the extent of any departure.

f. Should the United States conclude the a motion for a downward departure is appropriate, the Government agrees to recommend a sentence no greater than one-half of the low end of the sentencing range as set by the Court and agrees to recommend that said sentence run concurrent with any sentence imposed in the Northern District of Illinois and be no greater than any sentence imposed in the Northern District of Illinois.

## VII. Conclusion

21. The defendant understands that if he breaches this agreement, or violates any federal, state or local law, or any order of any court, including any condition of pre-trial, pre-sentence, or post-sentence release, the United States may void this agreement. In that event, the defendant's plea of guilty and the resulting guilty verdict will stand, and the United States will be free to proceed on any properly-filed dismissed, pending, superseding, or additional charges.

22.     There are no agreements, representations, or understandings between the parties in this case, other than those that are explicitly set forth in this Plea Agreement and none will be entered into unless executed in writing and signed by all the parties.

SO AGREED:

ROBERT J. CONRAD, JR., UNITED STATES ATTORNEY


_____         DATED: _____
ROBERT J. HIGDON, JR., Assistant United States Attorney


_____         DATED: 5/16/01
STEVE MUSLIN, Attorney for Defendant


_____         DATED: 5/16/01
WILLIAM McPHAUL, Defendant

**U.S. Department of Justice**

*United States Attorney*
*Western District of North Carolina*

---

*Organized Crime Drug Enforcement Task Force*
*Suite 1700, Carillon Building*
*227 West Trade Street*
*Charlotte, North Carolina 28202*
*(704) 344-6222*
*FAX (704) 344-6629*

May 14, 2001

Mr. Steven B. Muslin

    Re:   *AGREEMENT REQUIRING TRUTHFUL DISCLOSURE*

Dear Mr. Muslin:

    This letter is designed to grant "use immunity" as defined herein to your client, WILLIAM McPHAUL, for statements made to law enforcement officers and/or to the grand jury beginning on or about May 14, 2001. WILLIAM McPHAUL agrees to provide complete and truthful information about all criminal activity within his knowledge.

    In exchange the United States agrees not to make direct use of WILLIAM McPHAUL's statements, or any information provided by him, in any criminal proceeding. The indirect use of his statements, or other information, is permitted by this Agreement. This indirect use includes pursuing leads based on the statements and information provided by WILLIAM McPHAUL, as well as the use of the statements and information themselves at a subsequent trial for impeachment and rebuttal purposes.

Immunity Letter
May 14, 2001
Page 2

It is agreed that in the event that it is determined by the government that he has violated any provision of this Agreement (Including the provision that he provide complete and truthful information): (1) all statements made by him shall be admissible in evidence during the government's case-in-chief; and (2) he hereby waives any right to assert a claim under the United States Constitution, any statute, including but not limited to 18 U.S.C. § 3501, Rule 11(e)(6) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by him pursuant to this Agreement, should be suppressed.

Please execute this agreement by signing below and returning the original to my office. WILLIAM McPHAUL also understands that this immunity agreement does not apply to statements relating to his committing a homicide or other violent crime.

**THIS AGREEMENT IS NOT BINDING UNLESS THE ORIGINAL IS RETURNED TO THE UNDERSIGNED ASSISTANT UNITED STATES ATTORNEY**

Very truly yours,

Robert J. Conrad, Jr.
United States Attorney

By:

5/14/01
Date

ROBERT J. HIGDON, JR.
Assistant U.S. Attorney

6/16/01
Date

STEVEN B. MUSLIN, Attorney

_____
Date

WILLIAM McPHAUL

## AFFIDAVIT,
## WAIVER OF CLAIM AND NOTICE,
## AND CONSENT TO FORFEITURE OF
## PERSONAL PROPERTY BY REPRESENTED PERSON

I, _William McPhaul_, hereby state under penalty of perjury that:

I am at least 18 years of age.

I am the sole owner of the following personal property: _2002 Cadillac Escalade_
_VIN: 1GYEK63N12R102152_

I agree to forfeit all of this property to the United States. I have surrendered or will surrender the property to the United States Marshal or other agent of the United States. I understand and agree that the United States will or may commence a civil action for forfeiture of this property.

I therefore waive all claims I may have to the personal property listed above; stipulate to probable cause for its forfeiture as proceeds of and/or property used to facilitate _drug trafficking AND money laundering_ in violation of 18 U.S.C. §_981_ + _1956_ and/or 21 U.S.C. §____; agree to its forfeiture to the United States for disposition according to law; waive all claims to this property and further notice in any proceedings necessary to obtain a judgment of forfeiture; and consent to the Magistrate Judge conducting all proceedings necessary for the forfeiture of the property, including entry of judgment, pursuant to 28 U.S.C. §636(c).

_Willie m cPhaul_

Print Name: _Willie McPhaul_

Consented to:

_[signature]_

Attorney for _William McPhaul_

# McPhaul's Vehicle Purchases

| Date of Purchase | Purchaser | Vehicle | Purchase Price | Method of Payment | | | Seller | Comments |
|---|---|---|---|---|---|---|---|---|
| | | | | Trade - In | Trade - In Allowance | Cash | | |
| 01/06/1999 | Bessie Harris<br>7949 Turquoise Drive<br>Charlotte, NC | 1995 Cadillac Seville<br>(VIN 1G6KS52Y7SU806905) | $30,597.09 | 1995 Cadillac Seville<br>(VIN 1G6KS52Y7SU806905) | $21,597.09 | $9,000.00 | Southern Imports<br>6706 E. Independence Blvd<br>Charlotte, NC | |
| 01/11/1999 | Bessie Harris<br>7949 Turquoise Drive<br>Charlotte, NC | 1998 Chevrolet Tahoe<br>(VIN 1GNEK13R7WJ323908) | $39,332.00 | 1998 Chevrolet Tahoe<br>(VIN 1GNEK13R7WJ323908) | $30,000.00 | $9,332.00 | Southern Imports<br>6706 E. Independence Blvd<br>Charlotte, NC | |
| 12/31/1999 | Bessie Harris<br>7949 Turquoise Drive<br>Charlotte, NC | 1998 Lincoln Navigator<br>(VIN 5LMFU28L2WLJ05809) | $41,300.00 | 1998 Lincoln Navigator<br>(VIN 5LMFU28L2WLJ05809) | $31,300.00 | $10,000.00 | Southern Imports<br>6706 E. Independence Blvd<br>Charlotte, NC | |
| 02/26/2000 | Bessie Harris<br>7949 Turquoise Drive<br>Charlotte, NC | 1997 Lexus LS400<br>(VIN JT8BH28FXV0077633) | $36,999.00 | 1997 Lexus LS400<br>(VIN JT8BH28FXV0077633) | $31,000.00 | $6,030.00 | Southern Imports<br>6706 E. Independence Blvd<br>Charlotte, NC | |
| 05/12/2000 | Bessie Harris<br>7949 Turquoise Drive<br>Charlotte, NC | 2000 Ford Excursion<br>(VIN 1FMNU43S3YEA13761) | $38,939.00 | 2000 Ford Excursion<br>(VIN 1FMNU43S3YEA13761) | $35,000.00 | $3,940.00 | Southern Imports<br>6706 E. Independence Blvd<br>Charlotte, NC | |
| 05/18/2000 | Hit-Line Leasing, LLC<br>6706 E. Independence Blvd<br>Charlotte, NC | 2000 Jaguar S<br>(VIN SAJDA01C2YFL47010) | $45,800.00 | | | | Southern Imports<br>6706 E. Independence Blvd<br>Charlotte, NC | Elizabeth Jordan McPhaul's Vehicle -LEASED-<br>Structured Cash Payments |
| 06/07/2000 | Bessie Harris<br>7949 Turquoise Drive<br>Charlotte, NC | 2000 Lexus LX470<br>(VIN JT6HT00WXY0096821) | $58,094.42 | 2000 Lexus LX470<br>(VIN JT6HT00WXY0096821) | $32,019.41 | $26,075.00 | Southern Imports<br>6706 E. Independence Blvd<br>Charlotte, NC | |
| 03/17/2001 | Elizabeth Jordan McPhaul<br>7644 Fairway Mist Court<br>Charlotte, NC | 2002 Cadillac Escalade<br>(VIN 1GYEK63N12R121152) | $50,575.50 | 2000 Lexus LX470<br>(VIN JT6HT00WXY0096821) | $44,990.00 | $5,585.50 | Arnold Palmer Cadillac<br>8218 E. Independence Blvd<br>Charlotte, NC | Elizabeth Jordan McPhaul's Vehicle -LEASED- |
| | | Lexus GS300 | | | | | Southern Imports<br>6706 E. Independence Blvd<br>Charlotte, NC | Elizabeth Jordan McPhaul's Vehicle -LEASED- |
| | | Mercedes S500 | | | | | | Elizabeth Jordan McPhaul Vehicle -LEASED- |
| | TOTAL | | $ 341,637.01 | | | $69,962.50 | | |

# PART S - MONEY LAUNDERING AND MONETARY TRANSACTION REPORTING

<u>Historical Note</u>: Introductory Commentary to this Part, effective November 1, 1987, was deleted effective November 1, 1990 (<u>see</u> Appendix C, amendment 342).

§2S1.1.     <u>**Laundering of Monetary Instruments**</u>

    (a)     Base Offense Level:

       (1)     **23**, if convicted under 18 U.S.C. § 1956(a)(1)(A), (a)(2)(A), or (a)(3)(A);

       (2)     **20**, otherwise.

    (b)     Specific Offense Characteristics

       (1)     If the defendant knew or believed that the funds were the proceeds of an unlawful activity involving the manufacture, importation, or distribution of narcotics or other controlled substances, increase by 3 levels.

       (2)     If the value of the funds exceeded $100,000, increase the offense level as follows:

| <u>Value</u> (Apply the Greatest) | <u>Increase in Level</u> |
|---|---|
| (A)   $100,000 or less | no increase |
| (B)   More than $100,000 | add 1 |
| (C)   More than $200,000 | add 2 |
| (D)   More than $350,000 | add 3 |
| (E)   More than $600,000 | add 4 |
| (F)   More than $1,000,000 | add 5 |
| (G)   More than $2,000,000 | add 6 |
| (H)   More than $3,500,000 | add 7 |
| (I)   More than $6,000,000 | add 8 |
| (J)   More than $10,000,000 | add 9 |
| (K)   More than $20,000,000 | add 10 |
| (L)   More than $35,000,000 | add 11 |
| (M)   More than $60,000,000 | add 12 |
| (N)   More than $100,000,000 | add 13. |

    (c)     Special Instruction for Fines - Organizations

       (1)     In lieu of the applicable amount from the table in subsection (d) of §8C2.4 (Base Fine), use:

          (A)     the greater of $250,000 or 100 percent of the value of the funds if subsections (a)(1) and (b)(1) are used to determine the offense level; or

Case 3:04-cv-00400-RLV   Document 1   Filed 08/16/04   Page 44 of 56

(B)     the greater of $200,000 or 70 percent of the value of the funds if subsections (a)(2) and (b)(1) are used to determine the offense level; or

(C)     the greater of $200,000 or 70 percent of the value of the funds if subsection (a)(1) but not (b)(1) is used to determine the offense level; or

(D)     the greater of $150,000 or 50 percent of the value of the funds if subsection (a)(2) but not (b)(1) is used to determine the offense level.

*Commentary*

*Statutory Provision*:  18 U.S.C. § 1956.

*Background*:  The statute covered by this guideline is a part of the Anti-Drug Abuse Act of 1986, and prohibits financial transactions involving funds that are the proceeds of "specified unlawful activity," if such transactions are intended to facilitate that activity, or conceal the nature of the proceeds or avoid a transaction reporting requirement.  The maximum term of imprisonment authorized is twenty years.

In keeping with the clear intent of the legislation, this guideline provides for substantial punishment.  The punishment is higher than that specified in §2S1.2 and §2S1.3 because of the higher statutory maximum, and the added elements as to source of funds, knowledge, and intent.

A higher base offense level is specified if the defendant is convicted under 18 U.S.C. § 1956(a)(1)(A), (a)(2)(A), or (a)(3)(A) because those subsections apply to defendants who encouraged or facilitated the commission of further crimes.  Effective November 18, 1988, 18 U.S.C. § 1956(a)(1)(A) contains two subdivisions.  The base offense level of 23 applies to § 1956(a)(1)(A)(i) and (ii).

The amount of money involved is included as a factor because it is an indicator of the magnitude of the criminal enterprise, and the extent to which the defendant aided the enterprise. Narcotics trafficking is included as a factor because of the clearly expressed Congressional intent to adequately punish persons involved in that activity.

Historical Note:  Effective November 1, 1987.  Amended effective November 1, 1989 (see Appendix C, amendments 212-214); November 1, 1991 (see Appendix C, amendments 378 and 422).

## §2S1.2.   Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity

(a)     Base Offense Level:  **17**

(b)     Specific Offense Characteristics

Case 3:04-cv-00400-RLV   Document 1   Filed 08/16/04   Page 45 of 56

# PART S - MONEY LAUNDERING AND MONETARY TRANSACTION REPORTING

<u>Historical Note</u>: Introductory Commentary to this Part, effective November 1, 1987, was deleted effective November 1, 1990 (<u>see</u> Appendix C, amendment 342).

## §2S1.1.   <u>Laundering of Monetary Instruments</u>

(a)   Base Offense Level:

    (1)   **23**, if convicted under 18 U.S.C. § 1956(a)(1)(A), (a)(2)(A), or (a)(3)(A);

    (2)   **20**, otherwise.

(b)   Specific Offense Characteristics

    (1)   If the defendant knew or believed that the funds were the proceeds of an unlawful activity involving the manufacture, importation, or distribution of narcotics or other controlled substances, increase by 3 levels.

    (2)   If the value of the funds exceeded $100,000, increase the offense level as follows:

| <u>Value</u> (Apply the Greatest) | | <u>Increase in Level</u> |
|---|---|---|
| (A) | $100,000 or less | no increase |
| (B) | More than $100,000 | add 1 |
| (C) | More than $200,000 | add <u>2</u> |
| (D) | More than $350,000 | add 3 |
| (E) | More than $600,000 | add 4 |
| (F) | More than $1,000,000 | add 5 |
| (G) | More than $2,000,000 | add 6 |
| (H) | More than $3,500,000 | add 7 |
| (I) | More than $6,000,000 | add 8 |
| (J) | More than $10,000,000 | add 9 |
| (K) | More than $20,000,000 | add 10 |
| (L) | More than $35,000,000 | add 11 |
| (M) | More than $60,000,000 | add 12 |
| (N) | More than $100,000,000 | add 13. |

(c)   Special Instruction for Fines - Organizations

    (1)   In lieu of the applicable amount from the table in subsection (d) of §8C2.4 (Base Fine), use:

        (A)   the greater of $250,000 or 100 percent of the value of the funds if subsections (a)(1) and (b)(1) are used to determine the offense level; or

Case 3:04-cv-00400-RLV   Document 1   Filed 08/16/04   Page 46 of 56

(B)     the greater of $200,000 or 70 percent of the value of the funds if subsections (a)(2) and (b)(1) are used to determine the offense level; or

(C)     the greater of $200,000 or 70 percent of the value of the funds if subsection (a)(1) but not (b)(1) is used to determine the offense level; or

(D)     the greater of $150,000 or 50 percent of the value of the funds if subsection (a)(2) but not (b)(1) is used to determine the offense level.

*Commentary*

*Statutory Provision*:  *18 U.S.C. § 1956.*

*Background*:  *The statute covered by this guideline is a part of the Anti-Drug Abuse Act of 1986, and prohibits financial transactions involving funds that are the proceeds of "specified unlawful activity," if such transactions are intended to facilitate that activity, or conceal the nature of the proceeds or avoid a transaction reporting requirement.  The maximum term of imprisonment authorized is twenty years.*

*In keeping with the clear intent of the legislation, this guideline provides for substantial punishment.  The punishment is higher than that specified in §2S1.2 and §2S1.3 because of the higher statutory maximum, and the added elements as to source of funds, knowledge, and intent.*

*A higher base offense level is specified if the defendant is convicted under 18 U.S.C. § 1956(a)(1)(A), (a)(2)(A), or (a)(3)(A) because those subsections apply to defendants who encouraged or facilitated the commission of further crimes.  Effective November 18, 1988, 18 U.S.C. § 1956(a)(1)(A) contains two subdivisions.  The base offense level of 23 applies to § 1956(a)(1)(A)(i) and (ii).*

*The amount of money involved is included as a factor because it is an indicator of the magnitude of the criminal enterprise, and the extent to which the defendant aided the enterprise.  Narcotics trafficking is included as a factor because of the clearly expressed Congressional intent to adequately punish persons involved in that activity.*

*Historical Note*:  Effective November 1, 1987.  Amended effective November 1, 1989 (see Appendix C, amendments 212-214); November 1, 1991 (see Appendix C, amendments 378 and 422).

**§2S1.2.     Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity**

(a)     Base Offense Level:  **17**

(b)     Specific Offense Characteristics

Case 3:04-cv-00400-RLV   Document 1   Filed 08/16/04   Page 47 of 56

(1)     If the defendant knew that the funds were the proceeds of:

    (A)     an unlawful activity involving the manufacture, importation, or distribution of narcotics or other controlled substances, increase by 5 levels; or

    (B)     any other specified unlawful activity (<u>see</u> 18 U.S.C. § 1956(c)(7)), increase by 2 levels.

(2)     If the value of the funds exceeded $100,000, increase the offense level as specified in §2S1.1(b)(2).

(c)     Special Instruction for Fines - Organizations

(1)     In lieu of the applicable amount from the table in subsection (d) of §8C2.4 (Base Fine), use:

    (A)     the greater of $175,000 or 60 percent of the value of the funds if subsection (b)(1)(A) is used to determine the offense level; or

    (B)     the greater of $150,000 or 50 percent of the value of the funds if subsection (b)(1)(B) is used to determine the offense level.

<u>*Commentary*</u>

<u>*Statutory Provisions*</u>*:  18 U.S.C. § 1957.  For additional statutory provision(s), <u>see</u> Appendix A (Statutory Index).*

<u>*Application Note*</u>*:*

*1.     "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include racketeering offenses (18 U.S.C. § 1961(1)), drug offenses, and most other serious federal crimes but does not include other money-laundering offenses.*

<u>*Background*</u>*: The statute covered by this guideline is a part of the Anti-Drug Abuse Act of 1986, and prohibits monetary transactions that exceed $10,000 and involve the proceeds of "specified unlawful activity" (as defined in 18 U.S.C. § 1956), if the defendant knows that the funds are "criminally derived property."  (Knowledge that the property is from a specified unlawful activity is not an element of the offense.)  The maximum term of imprisonment specified is ten years.*

*The statute is similar to 18 U.S.C. § 1956, but does not require that the recipient exchange or "launder" the funds, that he have knowledge that the funds were proceeds of a specified unlawful activity, nor that he have any intent to further or conceal such an activity.  In keeping with the intent of the legislation, this guideline provides for substantial punishment.  The offense levels are higher than in §2S1.3 because of the higher statutory maximum and the added element of knowing that the funds were criminally derived property.*

*The 2-level increase in subsection (b)(1)(B) applies if the defendant knew that the funds were not merely criminally derived, but were in fact the proceeds of a specified unlawful activity. Such a distinction is not made in §2S1.1, because the level of intent required in that section effectively precludes an inference that the defendant was unaware of the nature of the activity.*

Historical Note: Effective November 1, 1987. Amended effective November 1, 1989 (see Appendix C, amendment 215); November 1, 1991 (see Appendix C, amendment 422).

### §2S1.3.  Structuring Transactions to Evade Reporting Requirements; Failure to Report Cash or Monetary Transactions; Failure to File Currency and Monetary Instrument Report; Knowingly Filing False Reports

(a)    Base Offense Level:  **6** plus the number of offense levels from the table in §2F1.1 (Fraud and Deceit) corresponding to the value of the funds.

(b)    Specific Offense Characteristics:

    (1)    If the defendant knew or believed that the funds were proceeds of unlawful activity, or were intended to promote unlawful activity, increase by **2** levels.

    (2)    If (A) subsection (b)(1) does not apply; (B) the defendant did not act with reckless disregard of the source of the funds; (C) the funds were the proceeds of lawful activity; and (D) the funds were to be used for a lawful purpose, decrease the offense level to level **6**.

(c)    Cross Reference

    (1)    If the offense was committed for the purposes of violating the Internal Revenue laws, apply the most appropriate guideline from Chapter Two, Part T (Offenses Involving Taxation) if the resulting offense level is greater than that determined above.

*Commentary*

*Statutory Provisions: 26 U.S.C. § 7203 (if a violation based upon 26 U.S.C. § 6050I), § 7206 (if a violation based upon 26 U.S.C. § 6050I); 31 U.S.C. §§ 5313, 5314, 5316, 5324. For additional statutory provision(s), see Appendix A (Statutory Index).*

*Application Note:*

*1.    For purposes of this guideline, "value of the funds" means the amount of the funds involved in the structuring or reporting conduct. The relevant statutes require monetary reporting without regard to whether the funds were lawfully or unlawfully obtained.*

Case 3:04-cv-00400-RLV   Document 1   Filed 08/16/04   Page 49 of 56

*Background*: *The offenses covered by this guideline relate to records and reports of certain transactions involving currency and monetary instruments. These reports include Currency Transaction Reports, Currency and Monetary Instrument Reports, Reports of Foreign Bank and Financial Accounts, and Reports of Cash Payments Over $10,000 Received in a Trade or Business.*

Historical Note: Effective November 1, 1987. Amended effective November 1, 1989 (see Appendix C, amendments 216-218); November 1, 1991 (see Appendix C, amendments 379 and 422); November 1, 1993 (see Appendix C, amendment 490).

## §2S1.4. [Deleted]

Historical Note: Section 2S1.4 (Failure to File Currency and Monetary Instrument Report), effective November 1, 1991 (see Appendix C, amendments 379 and 422), was deleted by consolidation with §2S1.3 effective November 1, 1993 (see Appendix C, amendment 490).

subject matter, or to relieve any person of any obligation imposed by any State or local law, see section 811 of Pub.L. 91–452, set out as a Priority of State Laws note under section 1511 of this title.

**Commission on the Review of the National Policy Toward Gambling**

Sections 804 to 809 of Pub.L. 91–452 established the Commission on the Review of the National Policy Toward Gambling, provided for its membership and compensation of the members and the staff, empowered the Commission to subpoena witnesses and grant immunity, required the Commission to make a study of gambling in the United States and existing federal, state, and local policy and practices with respect to prohibition and taxation of gambling activities and to make a final report of its findings and recommendations to the President and to Congress within four years of its establishment, and provided for its termination sixty days after submission of the final report.

## § 1956. Laundering of monetary instruments

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

(ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

(B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

(A) with the intent to promote the carrying on of specified unlawful activity; or

(B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer whichever is greater, or imprisonment for not more than twenty years, or both. For the purpose of the offense described in subparagraph (B), the defendant's knowledge may be established by proof that a law enforcement officer represented the matter specified in subparagraph (B) as true, and the defendant's subsequent statements or actions indicate that the defendant believed such representations to be true.

(3) Whoever, with the intent—

(A) to promote the carrying on of specified unlawful activity;

(B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or

(C) to avoid a transaction reporting requirement under State or Federal law,

conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both. For purposes of this paragraph and paragraph (2), the term "represented" means any representation made by a law enforcement officer or by another person at the direction of, or with the approval of, a Federal official authorized to investigate or prosecute violations of this section.

(b) Whoever conducts or attempts to conduct a transaction described in subsection (a)(1) or (a)(3), or a transportation, transmission, or transfer described in subsection (a)(2), is liable to the United States for a civil penalty of not more than the greater of—

(1) the value of the property, funds, or monetary instruments involved in the transaction; or

(2) $10,000.

(c) As used in this section—

(1) the term "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is specified in paragraph (7);

Case 3:04-cv-00400-RLV   Document 1   Filed 08/16/04   Page 51 of 56

subject matter, or to relieve any person of any obligation imposed by any State or local law, see section 811 of Pub.L. 91-452, set out as a Priority of State Laws note under section 1511 of this title.

**Commission on the Review of the National Policy Toward Gambling**

Sections 804 to 809 of Pub.L. 91-452 established the Commission on the Review of the National Policy Toward Gambling, provided for its membership and compensation of the members and the staff, empowered the Commission to subpoena witnesses and grant immunity, required the Commission to make a study of gambling in the United States and existing federal, state, and local policy and practices with respect to prohibition and taxation of gambling activities and to make a final report of its findings and recommendations to the President and to Congress within four years of its establishment, and provided for its termination sixty days after submission of the final report.

## § 1956. Laundering of monetary instruments

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

(ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

(B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

(A) with the intent to promote the carrying on of specified unlawful activity; or

(B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer whichever is greater, or imprisonment for not more than twenty years, or both. For the purpose of the offense described in subparagraph (B), the defendant's knowledge may be established by proof that a law enforcement officer represented the matter specified in subparagraph (B) as true, and the defendant's subsequent statements or actions indicate that the defendant believed such representations to be true.

(3) Whoever, with the intent—

(A) to promote the carrying on of specified unlawful activity;

(B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or

(C) to avoid a transaction reporting requirement under State or Federal law,

conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both. For purposes of this paragraph and paragraph (2), the term "represented" means any representation made by a law enforcement officer or by another person at the direction of, or with the approval of, a Federal official authorized to investigate or prosecute violations of this section.

(b) Whoever conducts or attempts to conduct a transaction described in subsection (a)(1) or (a)(3), or a transportation, transmission, or transfer described in subsection (a)(2), is liable to the United States for a civil penalty of not more than the greater of—

(1) the value of the property, funds, or monetary instruments involved in the transaction; or

(2) $10,000.

(c) As used in this section—

(1) the term "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is specified in paragraph (7);

(2) the term "conducts" includes initiating, concluding, or participating in initiating, concluding, or concluding a transaction;

(3) the term "transaction" includes a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument, use of a safe deposit box, or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected;

(4) the term "financial transaction" means (A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree;

(5) the term "monetary instruments" means (i) coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, and money orders, or (ii) investment securities or negotiable instruments, in bearer form or otherwise in such form that title thereto passes upon delivery;

(6) the term "financial institution" has the definition given that term in section 5312(a)(2) of title 31, United States Code, or the regulations promulgated thereunder;

(7) the term "specified unlawful activity" means—

(A) any act or activity constituting an offense listed in section 1961(1) of this title except an act which is indictable under subchapter II of chapter 53 of title 31;

(B) with respect to a financial transaction occurring in whole or in part in the United States, an offense against a foreign nation involving—

(i) the manufacture, importation, sale, or distribution of a controlled substance (as such term is defined for the purposes of the Controlled Substances Act);

(ii) murder, kidnapping, robbery, extortion, or destruction of property by means of explosive or fire;[1]

(iii) fraud, or any scheme or attempt to defraud, by or against a foreign bank (as defined in paragraph 7 of section 1(b) of the International Banking Act of 1978[2]

(C) any act or acts constituting a continuing criminal enterprise, as that term is defined in

section 408 of the Controlled Substances Act (21 U.S.C. 848);

(D) an offense under section 32 (relating to the destruction of aircraft), section 37 (relating to violence at international airports), section 115 (relating to influencing, impeding, or retaliating against a Federal official by threatening or injuring a family member), section 152 (relating to concealment of assets; false oaths and claims; bribery), section 215 (relating to commissions or gifts for procuring loans), section 351 (relating to congressional or Cabinet officer assassination), any of sections 500 through 503 (relating to certain counterfeiting offenses), section 513 (relating to securities of States and private entities), section 542 (relating to entry of goods by means of false statements), section 545 (relating to smuggling goods into the United States), section 549 (relating to removing goods from Customs custody), section 641 (relating to public money, property, or records), section 656 (relating to theft, embezzlement, or misapplication by bank officer or employee), section 657 (relating to lending, credit, and insurance institutions), section 658 (relating to property mortgaged or pledged to farm credit agencies), section 666 (relating to theft or bribery concerning programs receiving Federal funds), section 793, 794, or 798 (relating to espionage), section 831 (relating to prohibited transactions involving nuclear materials), section 844(f) or (i) (relating to destruction by explosives or fire of Government property or property affecting interstate or foreign commerce), section 875 (relating to interstate communications), section 956 (relating to conspiracy to kill, kidnap, maim, or injure certain property in a foreign country), section 1005 (relating to fraudulent bank entries), 1006 (relating to fraudulent Federal credit institution entries), 1007 (relating to fraudulent Federal Deposit Insurance transactions), 1014 (relating to fraudulent loan or credit applications), 1032 (relating to concealment of assets from conservator, receiver, or liquidating agent of financial institution), section 1111 (relating to murder), section 1114 (relating to murder of United States law enforcement officials), section 1116 (relating to murder of foreign officials, official guests, or internationally protected persons), section 1201 (relating to kidnapping), section 1203 (relating to hostage taking), section 1361 (relating to willful injury of Government property), section 1363 (relating to destruction of property within the special maritime and territorial jurisdiction), section 1708 (theft from the mail), section 1751 (relating to Presidential assassination), section 2113 or 2114 (relating to bank and postal robbery and theft), section 2280 (relating to violence against maritime navigation), sec-

Case 3:04-cv-00400-RLV   Document 1   Filed 08/16/04   Page 53 of 56

tion 2281 (relating to violence against maritime fixed platforms), section 2319 (relating to copyright infringement), section 2320 (relating to trafficking in counterfeit goods and services),,[3] section 2332 (relating to terrorist acts abroad against United States nationals), section 2332a (relating to use of weapons of mass destruction), section 2332b (relating to international terrorist acts transcending national boundaries), or section 2339A (relating to providing material support to terrorists) of this title, section 46502 of title 49, United States Code,[3] a felony violation of the Chemical Diversion and Trafficking Act of 1988 (relating to precursor and essential chemicals), section 590 of the Tariff Act of 1930 (19 U.S.C. 1590) (relating to aviation smuggling), section 422 of the Controlled Substances Act (relating to transportation of drug paraphernalia), section 38(c) (relating to criminal violations) of the Arms Export Control Act, section 11 (relating to violations) of the Export Administration Act of 1979, section 206 (relating to penalties) of the International Emergency Economic Powers Act, section 16 (relating to offenses and punishment) of the Trading with the Enemy Act, any felony violation of section 15 of the Food Stamp Act of 1977 [7 U.S.C.A. § 2024] (relating to food stamp fraud) involving a quantity of coupons having a value of not less than $5,000, any violation of section 543(a)(1) of the Housing Act of 1949 [42 U.S.C.A. § 1490s(a)(1)] (relating to equity skimming), or any felony violation of the Foreign Corrupt Practices Act; or

(E) a felony violation of the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.), the Ocean Dumping Act (33 U.S.C. 1401 et seq.), the Act to Prevent Pollution from Ships (33 U.S.C. 1901 et seq.), the Safe Drinking Water Act (42 U.S.C. 300f et seq.), or the Resources Conservation and Recovery Act (42 U.S.C. 6901 et seq.).

(F) Any act or activity constituting an offense involving a Federal health care offense.

(8) the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.

(d) Nothing in this section shall supersede any provision of Federal, State, or other law imposing criminal penalties or affording civil remedies in addition to those provided for in this section.

(e) Violations of this section may be investigated by such components of the Department of Justice as the Attorney General may direct, and by such components of the Department of the Treasury as the Secretary of the Treasury may direct, as appropriate and, with respect to offenses over which the United States Postal Service has jurisdiction, by the Postal Service.

Such authority of the Secretary of the Treasury and the Postal Service shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury, the Postal Service, and the Attorney General. Violations of this section involving offenses described in paragraph (c)(7)(E) may be investigated by such components of the Department of Justice as the Attorney General may direct, and the National Enforcement Investigations Center of the Environmental Protection Agency.

(f) There is extraterritorial jurisdiction over the conduct prohibited by this section if—

(1) the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and

(2) the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

(g) **Notice of conviction of financial institutions.**—If any financial institution or any officer, director, or employee of any financial institution has been found guilty of an offense under this section, section 1957 or 1960 of this title, or section 5322 or 5324 of title 31, the Attorney General shall provide written notice of such fact to the appropriate regulatory agency for the financial institution.

(h) Any[4] person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

(Added Pub.L. 99–570, Title XIII, § 1352(a), Oct. 27, 1986, 100 Stat. 3207–18, and amended Pub.L. 100–690, Title VI, §§ 6183, 6465, 6466, 6469(a)(1), 6471(a), (b), Title VII, § 7031, Nov. 18, 1988, 102 Stat. 4354, 4375, 4377, 4378, 4398; Pub.L. 101–647, Title I, §§ 105–108, Title XII, § 1205(j), Title XIV, §§ 1402, 1404, Title XXV, § 2506, Title XXXV, § 3557, Nov. 29, 1990, 104 Stat. 4791, 4792, 4831, 4835, 4862, 4927; Pub.L. 102–550, Title XV, §§ 1504(c), 1524, 1526(a), 1527(a), 1530, 1531, 1534, 1536, Oct. 28, 1992, 106 Stat. 4055, 4064 to 4067; Pub.L. 103–322, Title XXXII, § 320104(b), Title XXXIII, §§ 330008(2), 330011(l), 330012, 330019, 330021(1), Sept. 13, 1994, 108 Stat. 2111, 2142, 2145, 2146, 2149, 2150; Pub.L. 103–325, Title IV, §§ 411(c)(2)(E), 413(c)(1), (d), Sept. 23, 1994, 108 Stat. 2253, 2254, 2255; Pub.L. 104–132, Title VII, § 726, Apr. 24, 1996, 110 Stat. 1301; Pub.L. 104–191, Title II, § 246, Aug. 21, 1996, 110 Stat. 2018; Pub.L. 104–294, Title VI, §§ 601(f)(6), 604(b)(38), Oct. 11, 1996, 110 Stat. 3499, 3509; Pub.L. 106–569, Title VII, § 709(a), Dec. 27, 2000, 114 Stat. 3018.)

[1] So in original. Probably should be followed by "or".
[2] So in original. Closing parenthesis was struck out.
[3] So in original.
[4] So in original. Probably should not be capitalized.

## HISTORICAL AND STATUTORY NOTES
**References in Text**

Section 7201 or 7206 of the Internal Revenue Code of 1986, referred to in subsec. (a)(1)(A), is section 7201 or 7206 of Title 26, Internal Revenue Code.

Case 3:04-cv-00400-RLV   Document 1   Filed 08/16/04   Page 54 of 56

The Controlled Substances Act, referred to in subsec. (c)(7)(B), is Title II of Pub.L. 91-513, Oct. 27, 1970, 84 Stat. 1242, as amended, which is classified principally to subchapter I (section 801 et seq.) of chapter 13 of Title 21, Food and Drugs. Section 422 of that Act, referred to in subsec. (c)(7)(D), is classified to section 863 of Title 21. For complete classification of this Act to the Code, see Short Title note set out under section 801 of Title 21 and Tables.

Paragraph 7 of section 1(b) of the International Banking Act of 1978, referred to in subsec. (c)(7)(B), is par. (7) of section 1(b) of Pub.L. 95-369, Sept. 17, 1978, 92 Stat. 607, which is classified to section 3101(7) of Title 12, Banks and Banking.

The Chemical Diversion and Trafficking Act of 1988, referred to in subsec. (c)(7)(D), is Pub.L. 100-690, Title VI, §§ 6051 to 6061, Nov. 18, 1988, 102 Stat. 4312 to 4320. For complete classification of this Act to the Code, see Short Title note set out under section 801 of Title 21, Food and Drugs, and Tables.

Section 15 of the Food Stamp Act of 1977, referred to in subsec. (c)(7)(D), is section 15 of Pub.L. 88-525, Aug. 31, 1964, 78 Stat. 705, as amended, which is classified to section 2024 of Title 7, Agriculture.

The Housing Act of 1949, referred to in subsec. (c)(7)(D), is Act July 15, 1949, c. 338, 63 Stat. 413, as amended, which is classified principally to chapter 8A of Title 42 (42 U.S.C.A. § 1441 et seq.). For complete classification of this Act to the Code, see Short Title note set out under section 1441 of Title 42 and Tables.

The Foreign Corrupt Practices Act, referred to in subsec. (c)(7)(D), probably means the Foreign Corrupt Practices Act of 1977, Pub.L. 95-213, Title I, Dec. 19, 1977, 91 Stat. 1494 to 1498, as amended, which enacted sections 78dd-1 and 78dd-2 of Title 15, Commerce and Trade, and amended sections 78m and 78ff of Title 15. For complete classification of this Act to the Code, see section 101 of Pub.L. 95-213, set out as a Short Title of 1977 Amendments note under section 78a of Title 15 and Tables.

The Federal Water Pollution Control Act, referred to in subsec. (c)(7)(E), is Act June 30, 1948, c. 758, as amended generally by Pub.L. 92-500, § 2, Oct. 18, 1972, 86 Stat. 816, which is classified generally to chapter 26 (section 1251 et seq.) of Title 33, Navigation and Navigable Waters. For complete classification of this Act to the Code, see Short Title note set out under section 1251 of Title 33 and Tables.

The Ocean Dumping Act, also known as the Marine Protection, Research and Sanctuaries Act of 1972, referred to in subsec. (c)(7)(E), is Pub.L. 92-532, Oct. 23, 1972, 86 Stat. 1052, as amended, which is classified principally to chapter 27 (section 1401 et seq.) of Title 33, Navigation and Navigable Waters. For complete classification of this Act to the Code, see Short Title note set out under section 1401 of Title 33 and Tables.

The Act to Prevent Pollution from Ships, referred to in subsec. (c)(7)(E), is Pub.L. 96-478, Oct. 21, 1980, 94 Stat. 2297. For complete classification of this Act to the Code, see Short Title note under section 1901 of Title 33, Navigation and Navigable Waters and Tables.

The Safe Drinking Water Act, referred to in subsec. (c)(7)(E), is Pub.L. 93-523, Dec. 16, 1974, 88 Stat. 1660, as amended, which is classified principally to subchapter XII (section 300f et seq.) of chapter 6A of Title 42, The Public

Health and Welfare. For complete classification of this Act to the Code, see Short Title of 1974 Amendments note set out under section 201 of Title 42 and Tables.

The Resource Conservation and Recovery Act of 1976, referred to in subsec. (c)(7)(E), is Pub.L. 94-580, Oct. 21, 1976, 90 Stat. 2796, as amended, which is classified generally to chapter 82 (section 6901 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 6901 of this Title and Tables.

**Effective and Applicability Provisions**

**1996 Acts.** Amendment by section 604 of Pub.L. 104-294 effective Sept. 13, 1994, see section 604(d) of Pub.L. 104-294, set out as a note under section 604 of this Title.

**1994 Acts.** Section 413(d) of Pub.L. 103-325 provided in part that the amendment made by such section, repealing section 3557(2)(E) of Pub.L. 101-647 (which amended this section), was to take effect on the date of enactment of section 3557(2)(E) of Pub.L. 101-647, which was approved Nov. 29, 1990.

Section 330011(*l*) of Pub.L. 103-322 provided in part that the amendment made by such section, repealing section 3557(2)(E) of Pub.L. 101-647 (which amended this section), was to take effect on the date of enactment of section 3557(2)(E) of Pub.L. 101-647, which was approved Nov. 29, 1990.

**1992 Acts.** Except as otherwise provided, amendment by Pub.L. 102-550 effective Oct. 28, 1992, see section 2 of Pub.L. 102-550, set out as a note under section 5301 of Title 42, The Public Health and Welfare.

**Repeals**

Section 3557(2)(E) of Pub.L. 101-647, set out in the credit to this section, was repealed by section 330011(*l*) of Pub.L. 103-322 and also repealed by section 413(d) of Pub.L. 103-325.

## § 1957. Engaging in monetary transactions in property derived from specified unlawful activity

(a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

(b)(1) Except as provided in paragraph (2), the punishment for an offense under this section is a fine under title 18, United States Code, or imprisonment for not more than ten years or both.

(2) The court may impose an alternate fine to that imposable under paragraph (1) of not more than twice the amount of the criminally derived property involved in the transaction.

(c) In a prosecution for an offense under this section, the Government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity.

Case 3:04-cv-00400-RLV    Document 1    Filed 08/16/04    Page 55 of 56

(d) The circumstances referred to in subsection (a) are—

(1) that the offense under this section takes place in the United States or in the special maritime and territorial jurisdiction of the United States; or

(2) that the offense under this section takes place outside the United States and such special jurisdiction, but the defendant is a United States person (as defined in section 3077 of this title, but excluding the class described in paragraph (2)(D) of such section).

(e) Violations of this section may be investigated by such components of the Department of Justice as the Attorney General may direct, and by such components of the Department of the Treasury as the Secretary of the Treasury may direct, as appropriate and, with respect to offenses over which the United States Postal Service has jurisdiction, by the Postal Service. Such authority of the Secretary of the Treasury and the Postal Service shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury, the Postal Service, and the Attorney General.

(f) As used in this section—

(1) the term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in section 1956(c)(5) of this title) by, through, or to a financial institution (as defined in section 1956 of this title), including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title, but such term does not include any transaction necessary to preserve a person's right to representation as guaranteed by the sixth amendment to the Constitution;

(2) the term "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense; and

(3) the term "specified unlawful activity" has the meaning given that term in section 1956 of this title.
(Added Pub.L. 99–570, Title XIII, § 1352(a), Oct. 27, 1986, 100 Stat. 3207–21, and amended Pub.L. 100–690, Title VI, §§ 6182, 6184, 6469(a)(2), Nov. 18, 1988, 102 Stat. 4354, 4377; Pub.L. 102–550, Title XV, §§ 1526(b), 1527(b), Oct. 28, 1992, 106 Stat. 4065; Pub.L. 103–322, Title XXXIII, § 330020, Sept. 13, 1994, 108 Stat. 2149; Pub.L. 103–325, Title IV, § 413(c)(2), Sept. 23, 1994, 108 Stat. 2255.)

## § 1958.  Use of interstate commerce facilities in the commission of murder-for-hire

(a) Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined under this title or imprisoned for not more than twenty years, or both; and if death results, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both.

(b) As used in this section and section 1959—

(1) "anything of pecuniary value" means anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage;

(2) "facility of interstate commerce" includes means of transportation and communication; and

(3) "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.
(Added Pub.L. 98–473, Title II, § 1002(a), Oct. 12, 1984, 98 Stat. 2136, § 1952A; renumbered § 1958 and amended Pub.L. 100–690, Title VII, §§ 7053(a), 7058(b), Nov. 18, 1988, 102 Stat. 4402, 4403; Pub.L. 101–647, Title XII, § 1205(k), Title XXXV, § 3558, Nov. 29, 1990, 104 Stat. 4831, 4927; Pub.L. 103–322, Title VI, § 60003(a)(11), Title XIV, § 140007(b), Title XXXII, § 320105, Title XXXIII, § 330016(1)(L), (N), (Q), Sept. 13, 1994, 108 Stat. 1969, 2033, 2111, 2147, 2148; Pub.L. 104–294, Title VI, §§ 601(g)(3), 605(a), Oct. 11, 1996, 110 Stat. 3500, 3509.)

## HISTORICAL AND STATUTORY NOTES

Codifications

Amendment by section 7058(b) of Pub.L. 100–690 was executed to subsec. (a) as the probable intent of Congress despite lack of directory language that "section 1958 of title 18" be amended.

## § 1959.  Violent crimes in aid of racketeering activity

(a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished—

(1) for murder, by death or life imprisonment, or a fine under this title, or both; and for kidnapping,

Case 3:04-cv-00400-RLV   Document 1   Filed 08/16/04   Page 56 of 56