IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:04CV400-2-V
(3:01CR99-01-V)


WILLIE McPHAUL,                    )
        Petitioner,                )
                                   )
            v.                     )          O R D E R
                                   )
UNITED STATES OF AMERICA,          )
        Respondent.                )
_____     )


        **THIS MATTER** is before this Court upon Petitioner's Motion
to Vacate, Set Aside, or Correct under 28 U.S.C. §2255, filed
August 16, 2004 (document # 1); on the "United States' Response
To Petition And Motion For Summary Judgment," filed October 27,
2004 (document # 7); on a document captioned as "Petitioner's
Response To Government's Reply In Opposition Of Petitioner's
2255," filed December 14, 2004 (document # 11); and on Peti-
tioner's "Supplement To Motion To Vacate . . . ," filed March 7,
2005 (document # 12).  For the reasons stated herein, the Govern-
ment's Motion for Summary Judgment will be <u>granted</u>; and
Petitioner's Motion to Vacate will be <u>denied</u> and <u>dismissed</u>.

## I.  <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

        In or around 1996,[1] Petitioner began trafficking in cocaine

_____

        [1]The facts underlying Petitioner's Motion to Vacate are somewhat com-
plex, and were extrapolated from several documents, including those which were
filed in connection with this Motion, and those filed in his criminal cases in

in the Illinois/Wisconsin areas. At some point in 1996, the
Federal Bureau of Investigation in Chicago began an investigation
of Petitioner. On January 23, 1997, a Bill of Information was
filed in federal Court in Chicago, charging Petitioner with one
count of possession with intent to distribute and distribution of
cocaine base. Once Petitioner learned of the charge, he fled to
Charlotte, North Carolina. However, on or about March 19, 1998,
Petitioner returned to Chicago, presented himself to authorities
there, and agreed to cooperate in an investigation and prosecu-
tion of other drug traffickers in the Chicagoland area.

After his arrest in Chicago, Petitioner was released on bond
and allowed to return to Charlotte with the expectation that he
periodically would return to work with the Chicago agents. At
the time he agreed to cooperate, the federal agents in Chicago
"offered to pay [Petitioner] for his efforts. [Petitioner, who
felt it was his duty to help the government, refused the offer.
He informed the agents that he had 'money saved and would be al-
right.'" (Report prepared on the request of Petitioner's trial
attorney by the National Center on Institutions and Alternatives,
dated April 7, 2003 at p. 11).

From March 1998 until sometime after June 2005, Petitioner
regularly traveled between Charlotte and Chicago, purportedly to
cooperate with Chicago authorities. During that time, at least

five major drug traffickers were arrested and prosecuted fol-
lowing their government-monitored purchases of large quantities
of cocaine from Petitioner.  Upon their arrests and debriefings,
four of the five traffickers told authorities that prior to their
arrests, they had been engaging in drug deals with Petitioner.
In fact, one of the four stated that he regularly had traded
drugs with Petitioner since about 1995; three of the four claimed
that the drugs which authorities caught them selling to Petition-
er actually were packages which he had sold to them only days
before he set them up; and one explained that Petitioner had
"beat[en] the system" by continuing to sell drugs after agreeing
to cooperate with authorities.

During the same period in which Petitioner was setting up
the foregoing drug dealers, he also was spending time in Char-
lotte, where he was engaging in the activities which gave rise to
his money laundering prosecution here.  In particular, on January
6, 1999, Petitioner went to Southern Imports of Charlotte and
purchased a 1998 Chevrolet Tahoe valued at approximately $30,500.
As payment for that  vehicle, Petitioner traded in a 1995 Cadil-
lac, for which David Smith gave him a trade-in allowance of about
$21,500.  Petitioner paid the difference of $9,000 in cash, and
had the title to his new vehicle placed in his mother's name,
Bessie Harris.

Five days later, on January 11, 1999, Petitioner returned to

David Smith at Southern Imports and purchased a 1998 Lincoln Navigator for approximately $39,300. As payment for that vehicle, Petitioner traded in the Tahoe which he had bought only days before, and was given a trade-in allowance of $30,000. Petitioner paid the difference of $9,300 in cash, and also had that vehicle titled in his mother's name.

On December 31, 1999, Petitioner returned to Smith at Southern Imports for yet another purchase. That time, Petitioner bought a 1997 Lexus LS400 for approximately $41,000. Once again, Petitioner used his preceding purchase as a partial payment for his new vehicle. Smith gave Petitioner a $31,300 trade-in allowance for the Navigator, and Petitioner paid the $10,000 difference in cash. Petitioner also had the Lexus placed in his mother's name.

Two months later, on February 26, 2000, Petitioner traded in his Lexus for a 2000 Ford Excursion at Southern Imports. Smith gave Petitioner an allowance of $31,000 toward the nearly $37,000 purchase price of the Excursion. Petitioner paid the $6,000 balance in cash and, again, had the vehicle titled in his mother's name.

Three months later, on May 12, 2000, Petitioner traded in his 2000 Ford Excursion for another 2000 Ford Excursion at Southern Imports. Smith gave Petitioner a $35,000 allowance toward the nearly $39,000 purchase price of the second Excursion. Peti-

4

tioner paid the $4,000 difference in cash and had his second Excursion titled in his mother's name.

About one week later, on May 18, 2000, Petitioner returned to Southern Imports and leased a 2000 model Jaguar S for about $45,800. Petitioner leased that car in the name of "Hi-Line Leasing, LLC."

On June 7, 2000, Petitioner traded in his second Excursion for a 2000 model Lexus LX470 for which he paid $58,000 at Southern Imports. Smith gave Petitioner an allowance of about $32,000 for the Excursion, and Petitioner paid the $26,000 balance in structured cash payments.

Unbeknownst to Petitioner, at some point during the time that he was laundering his money with David Smith, Smith had been approached by federal law enforcement authorities in Charlotte and questioned about certain financial irregularities of which he was suspected. Smith agreed to cooperate and informed authorities of Petitioner's on-going transactions. Consequently, in January 2001, federal agents in Charlotte began investigating Petitioner.

Unbeknownst to those Charlotte agents, however, David Smith had made at least one cocaine purchase from Petitioner. That is, sometime in or about February 2001, Smith purchased a kilogram of powder cocaine from Petitioner for $24,000 in cash.

On March 17, 2001, Petitioner made his final vehicle pur-

chase from Smith at Southern Imports.  That time, Petitioner
bought a 2002 model Cadillac Escalade for $50,500.  Petitioner
received a trade-in allowance of nearly $45,000 for his Lexus; he
paid the $5,500 balance in cash; and he had that vehicle titled
in the name of his wife, Elizabeth Jordan McPhaul.

During the week of May 11, 2001, Charlotte investigators
learned that Petitioner had a drug charge pending in Chicago, and
was a cooperating informant for authorities there.  On May 11,
2001, Charlotte agents approached Petitioner about their suspi-
cions of his money laundering activities.

In response, Petitioner admitted that he had been laundering
money.  Petitioner also advised that he was a cooperating infor-
mant in Chicago, and was willing to work with Charlotte's agents.
In particular, Petitioner told the agents that he could assist
them with setting up an undercover purchase of Ecstasy tablets
from David Smith.  In response to the agents' questions, Peti-
tioner emphatically denied that he previously had engaged in any
type of drug transactions with Smith.

On May 14, 2001, Petitioner made a recorded call to Southern
Imports in order to set up a drug deal with Smith.  Smith was
unavailable, but agents recorded Petitioner's conversation with
another salesperson who asked Petitioner if he had any cocaine
for sale.  When questioned by agents about that comment, Peti-
tioner denied that he had dealt any cocaine to the salesperson

and, instead, claimed that the salesperson merely was asking for a small user quantity of drugs.

On May 15, 2001, Petitioner made a recorded call to Smith, during which Smith agreed to sell Petitioner about 500 Ecstasy tablets. During that conversation, however, Smith also mentioned the parties' earlier cocaine transaction. When questioned by authorities about Smith's comment, Petitioner claimed that he previously had sold Smith an eighth of an ounce of cocaine.

On May 16, 2001, Petitioner entered into a written Plea Agreement with the government, whereby he agreed to plead guilty to a single money laundering charge which was to be set forth in a Bill of Information. By his Plea Agreement, Petitioner stipulated that the amount of funds involved in his offense was more than $200,000 but less than $350,00; and that he knew or believed that such funds were the proceeds of an unlawful activity involving the trafficking in drugs. That Agreement also memorialized Petitioner's promise to cooperate, and the Government's promise to evaluate such cooperation in order to determine whether or not to seek a reduced sentence for Petitioner on that basis.

Specifically concerning his cooperation, the Agreement reflected Petitioner's promise truthfully to disclose all monies and other valuables which were derived from or furnished for the purchase or exchange of controlled substances; his promise voluntarily to forfeit those items to the Government; and his promise

to undergo a polygraph examination, at the Government's request, in order to verify the truth of his information. Last, the Agreement provided that in the event Petitioner failed strictly to comply with its terms, it would become void, but Petitioner's guilty plea and the resulting verdict would remain valid and in effect.

Petitioner also signed a "use immunity" agreement which required him to give law enforcement officers and/or agents complete and truthful information about all criminal activity within his knowledge. That Agreement also warned Petitioner that his violation of any of its provisions, as determined by the Government, would render his statements admissible against him.

Also on May 16, 2001, Petitioner and an undercover agent went to Southern Imports to purchase the Ecstasy tablets from Smith. Petitioner, who had a recording device secreted on his person, completed the purchase outside of the agent's presence. However, when the agents listened to the recording of the sale, they heard Smith reference his earlier cocaine deal with Petitioner and the $24,000 purchase price. After questioning, Petitioner finally admitted that he had sold Smith a full kilogram of cocaine, but denied having engaged in any other drug sales with anyone.

At that point, the Government terminated Petitioner's cooperation in its investigation. The Government also made

Petitioner turn over his 2002 Escalade and about $17,000 in cash.

On May 18, 2001, a Bill of Information was filed in this Court, charging that since January 1999, Petitioner had conspired to launder money, all in violation of 18 U.S.C. § 1956(h). That Information also contains a provision by which Petitioner was given notice that the Government was going to forfeit his interest the 2002 Cadillac Escalade and a Mercedes S500.

On August 29, 2001, this Court held a Plea and Rule 11 Hearing. On that occasion, the Court engaged Petitioner in its standard colloquy to ensure that his guilty plea was being intelligently and voluntarily tendered. After hearing Petitioner's responses to its questions -- including his admission that he was tendering his guilty plea to the conspiracy charge because he, in fact, was guilty of that offense -- the Court determined that the plea was knowingly and willingly tendered. Accordingly, the Court conditionally accepted Petitioner's plea.

On November 8, 2001, Chicago authorities filed a Bill of Indictment against Petitioner and Robert Hamilton in the Northern District of Illinois. That Indictment charged the men with possessing with intent to distribute more than 250 grams of cocaine on March 9, 1997.

On January 11, 2002, Petitioner entered into a written Plea Agreement with Chicago authorities. Also on that date, Petitioner appeared in Court in Chicago and entered his guilty plea.

On April 5, 2002, Chicago authorities arrested and debriefed Robert Hamilton. According to Hamilton, Petitioner began using him to transport cocaine from Chicago to Charlotte in late 1997. Hamilton further stated that he had made regular trips for Petitioner until August 1998, when a routine traffic stop in Illinois revealed his possession of $39,000 in cash and cocaine residue. Hamilton stated that the money which was found belonged to Petitioner; and that he had been on his way to pick up drugs from Chicago for Petitioner.

Hamilton told authorities that he had stopped making pick-ups/deliveries for Petitioner after his arrest in August 1998; but in early 2001, he had agreed to make another trip. However, Hamilton stated that he did not make the 2001 trip because the deal had fallen through. Authorities were able to verify that during the period in question, numerous people who were connected with both Petitioner and Hamilton had made numerous money wires to Hamilton on or around the times when Hamilton reportedly was summoned to Charlotte to make drug trips for Petitioner.

After reviewing all of the information which they had received in their debriefing sessions, Chicago authorities questioned Petitioner about the allegations of his on-going drug trafficking. Petitioner denied those claims, but refused to take a polygraph examination. Thereafter, Chicago authorities advised Charlotte authorities of the information which had been gleaned

from their interviews.  On or about May 24, 2002, the Chicago prosecutor filed a Motion to Vacate Petitioner's Plea Agreement based upon his belief that Petitioner had continued to deal drugs after the time that he had entered his guilty plea in that District; and Petitioner's refusal of the polygraph test.

On June 13, 2002, the Charlotte prosecutor wrote Petitioner's defense attorney, advising that he had received credible information that Petitioner had continued to traffic in drugs and requesting, pursuant to the terms of the parties' Charlotte Plea Agreement, that Petitioner submit to a polygraph examination. Defense counsel did not respond to that letter.

On November 6, 2002, the Chicago Court held a hearing on the Government's Motion to Vacate Petitioner's Plea Agreement.  During that hearing, the Court received testimony from several of the Chicago agents who had conducted the investigations and de-briefings of Petitioner and the persons against whom Petitioner had cooperated.  Those agents told of Petitioner's cooperation. However, they also testified about the allegations of Petitioner's continued drug trafficking.  The Court also heard testimony from one of the Charlotte agents to whom Petitioner had confessed his January 2001 cocaine sale to David Smith in Charlotte.

The Chicago Court found that Petitioner likely had been engaging in unlawful activity during the time that he was suppose to be obeying the law and cooperating with those authorities.

However, that Court declined to vacate Petitioner's Plea Agreement because his refusal to take a polygraph examination was not prohibited by that Agreement.

Thereafter, on January 24, 2003, the Chicago Court convicted Petitioner of the drug trafficking charge and sentenced him to 146 months imprisonment.

On April 10, 2003, this Court called Petitioner's case for a Factual Basis and Sentencing Hearing.  At that time, the Government announced that it was not going to seek a downward departure for Petitioner.  After hearing from the parties, the Court continued the sentencing proceeding, but entertained the Government's request to revoke Petitioner's bond on the basis of a threat which he was alleged to have made to one of the Charlotte agents.  At the conclusion of the hearing, the Court found that there was clear and convincing evidence that Petitioner had become a danger to the community.  Accordingly, the Court revoked Petitioner's bond.

On May 14, 2003, Petitioner, through his original and his newly hired defense attorneys, filed a Motion to Reconsider Bond Revocation.  However, on June 12, 2003, the Court entered an Order denying that Motion.

On July 3, 2003, defense counsel filed a document captioned as a "Motion To Enforce Plea Agreement Or In The Alternative Depart Under U.S. Sentencing Guideline 5K2 Or Vacate Plea And Plea

Agreement And Set Cause Herein For Trial." There, counsel argued that Petitioner fully had complied with the terms of his Plea Agreement; that the Government's decision not to seek a reduced sentence under U.S. Sentencing Guidelines § 5K1.1 was based upon their bad faith motives; and that it would have been fundamentally unfair to Petitioner if the Government were allowed to avoid its obligation under the Agreement. Furthermore, defense counsel argued, in part, that there was no credible evidence that Petitioner had engaged in any illegal activity since May 2001 when he entered into his Charlotte Plea Agreement; and, in the alternative, counsel argued that the facts of Petitioner's case placed it outside the heartland of typical cases, thereby justifying a sentence reduction under U.S. Sentencing Guidelines § 5k2.

On July 16, 2003, the Government filed its Response, arguing that it was not required to seek a reduction for Petitioner; and that its decision not to do so was based upon the evidence of his continued criminal activity, refusal to submit to a polygraph examination, and his act of threatening a Charlotte agent.

On July 17, 2003, defense counsel filed a Motion for Recusal, asking the Honorable Richard L. Voorhees to recuse himself on the ground that his earlier finding that the agent's testimony regarding Petitioner's threat was "highly credible" showed an inability to be impartial concerning the evidence. On August 7,

2003, Judge Voorhees denied Petitioner's Motion for Recusal, no-
ting that the basis for the opinion of the agent's testimony was
not extra-judicial; and that no reasonable person with knowledge
of the circumstances of Petitioner's case would question Judge
Voorhees' impartiality.

On August 19, 2003, the Court held Petitioner's Sentencing
Hearing.  For his part, Petitioner reiterated that he had pled
guilty because he, in fact, had committed the offense.  Accord-
ingly, the Court unconditionally accepted his guilty plea.  Upon
Petitioner's stipulation to the existence of a factual basis as
reflected in his Plea Agreement, the Court found that there was a
factual basis for the plea and convicted Petitioner of the
conspiracy charge.

Regarding his Pre-Sentence Report, the Court sustained Peti-
tioner's objection to the inclusion of a claim that he had sold
Ecstasy tablets, and ordered the information deleted from the
Report.  The Court also sustained Petitioner's objection to a
recommended two-point enhancement for obstruction of justice.
Additionally, the Court agreed with both parties that Petitioner
should not have received a six-point increase to his offense
level under § 2S1.1(b)(1) of the Guidelines.

Particularly relevant here, defense counsel objected to a
three-level enhancement for the funds having been the proceeds of
his money laundering activities.  The attorneys argued that since

Chicago authorities had allowed Petitioner to use his drug traf-
ficking proceeds for his living expenses, his offense level
should not have been increased.  The Government replied that
Petitioner already had stipulated to the increase under his Plea
Agreement.  Thus, the Court rejected that objection, finding that
the enhancement properly was imposed.

The Court also rejected Petitioner's argument that his Cri-
minal History Category was overstated by the true nature of his
prior convictions.  Instead, the Court determined that the Report
correctly reflected Petitioner's Criminal Offense Level at 22 and
his Criminal History Category at VI, yielding a sentencing range
of 84 to 105 months imprisonment.

In addition, the Court determined that Petitioner had failed
to make a threshold showing that the Government's refusal to seek
a downward departure was grounded in bad faith.  Therefore, the
Court denied Petitioner's Motion to Enforce the Plea Agreement
and his request for a departure under § 5K2.0.  Ultimately, the
Court sentenced Petitioner to 84 months imprisonment, to be
served concurrently with his 146-month sentence from Chicago.

Petitioner did not directly appeal either his conviction or
his sentence.  Instead, on August 16, 2004, Petitioner, through
two newly retained attorneys, filed the instant Motion to Vacate.
Therein, habeas counsel make numerous arguments under three
separately denominated claims.  First, habeas counsel allege that

Petitioner's guilty plea was not voluntarily and intelligently made because he should not have been charged with an offense; therefore, defense counsel[2] was ineffective for having allowed him to plead guilty instead of challenging the charge under the doctrines of "entrapment by estoppel" and "collateral estoppel."

Second, habeas counsel claim that trial counsel was ineffective for having failed to argue that the Court's inclusion of certain offense-level increases violated the rule announced in Blakely v. Washington, 542 U.S. 296 (2004). Last, habeas counsel argue that trial counsel was ineffective for having failed to raise the foregoing issues with this Court and on appeal.

On October 27, 2004, the Government filed its combined Response and Motion for Summary Judgment, arguing that Petitioner's claims should be rejected for their lack of merit. On December 1, 2004, Petitioner's so-called Response to Government's Reply was filed. In purported support of their Response, habeas counsel attached, among other documents, an Affidavit by Petitioner.

Then, on March 7, 2005, habeas counsel filed a document captioned as a "Supplement To Motion To Vacate . . . ." There, counsel argue that the two offense-level increases also violated the rule announced in United States v. Booker, 543 U.S. 220 (2005).

---

[2]All of habeas counsels' references to "trial counsel" are to Steve Muslin and not Claire Rauscher, who was hired late in the course of Petitioner's prosecution in this District. Therefore, the Court will construe Petitioner's claims of ineffectiveness as against only Mr. Muslin.

Now, after carefully having reviewed the parties' arguments and the relevant legal precedent, the Court has determined that Petitioner is not entitled to any relief on his claims.

## II.  **ANALYSIS**

### A.  **Petitioner's guilty plea was not invalidated by any deficiency in trial counsel's performance**.

By their first claim, habeas counsel argue that Petitioner's guilty plea is invalid and unenforceable "in light of the fact that North Carolina knew, or should have known, that Chicago had already been informed of Petitioner's conduct with David Smith." That is, habeas counsel argue that Charlotte prosecutors were collaterally estopped from charging Petitioner with a money laundering offense by virtue of the Chicago authorities' authorization of his use of such drug proceeds for living expenses and in connection with his cooperation against drug traffickers, including David Smith.

According to habeas counsel, the Chicago authorities' "willful blindness" to Petitioner's retention of his drug proceeds, in order to allow him to travel between Chicago and Charlotte to work on their investigations of drug traffickers, like Smith and others, estopped Charlotte authorities from charging him with the subject money laundering conspiracy.  Relying upon those assertions, habeas counsel argue that trial counsel was ineffective for having failed to assert an "entrapment by estoppel" or will-

ful blindness defense; therefore, Petitioner's guilty plea was not knowingly and intelligently made.

In response, the Government asserts that Petitioner's estoppel claim has no basis in fact. Essentially, the Government asserts that it was not estopped from charging Petitioner with money laundering by virtue of any agreement which he claims to have had with authorities in Chicago; that the record of Petitioner's criminal proceedings reflect that his guilty plea was knowingly and freely made; that the manner in which the Court calculated Petitioner's sentence did not violate his constitutional rights; that Petitioner failed even to allege that he had asked counsel to appeal; and, therefore, that Petitioner cannot establish that counsel was ineffective in his representation of Petitioner.

In addition, the Government has submitted Affidavits from, inter alia, Steve Muslin, one of Petitioner's defense attorneys, the Chicago prosecutor, and the lead agent from the Chicago investigation. Such Affidavits tend to show that: (1) there was no Chicago investigation of any kind involving David Smith; (2) Petitioner's cooperation against Smith did not originate with Chicago authorities, but under a Charlotte criminal investigation which was entirely unrelated to Chicago's previously initiated

investigation of Petitioner and other drug traffickers there;[3] (3) in 2001, Chicago authorities were advised of the Charlotte money laundering investigation of Petitioner, after it already had been commenced in this District; (4) Petitioner was not authorized by authorities in any jurisdiction to launder his drug proceeds; and (5) Petitioner was not authorized to sell cocaine to Smith by authorities from any jurisdiction.

Habeas counsel have submitted Petitioner's Affidavit, which they did not bother to submit until after the Government had sub-mitted its Affidavits. In any event, Petitioner's Affidavit states, among other things, that: (1) during the "time of [his] cooperation, the government knew that [he] was not gainfully employed"; (2) he did not secure a lawful means for supporting himself until he and his wife opened a hair salon in Charlotte, which event was about two years after he had begun cooperating with Chicago authorities; (3) "Joe Dabono was the [Chicago] agent that [he] worked with regarding David Smith"; and (4) "[t]here was a Chicago agent involved in the deals that were set up in North Carolina[, but Petitioner does] not recall this agent's name." Notwithstanding the foregoing assertions, however, Petitioner concedes that he does "not know what the Charlotte

---

[3] Habeas counsel attempt to support their assertion that the investiga-tion of David Smith first began in Chicago with certain unsubstantiated remarks made by Mr. Muslin during Petitioner's sentencing hearings, and with the Chicago Judge's isolated remark that he knew who David Smith was. However, the greater weight of the evidence reflects that there was no Chica-go investigation of Smith.

United States Attorney's Office knew or should have known . . . "
concerning his arrangements with Chicago authorities.

With respect to allegations of ineffective assistance of
counsel, a petitioner must show that counsel's performance was
constitutionally deficient to the extent it fell below an objec-
tive standard of reasonableness, and that he was prejudiced
thereby.  Strickland v. Washington, 466 U.S. 668, 687-91 (1984).
In making this determination, there is a strong presumption that
counsel's conduct was within the wide range of reasonable pro-
fessional assistance. Id. at 689; see also Fields v. Attorney
Gen'l. of Md., 956 F.2d 1290, 1297-99 (4th Cir.), cert. denied,
474 U.S. 865 (1985); Hutchins v. Garrison, 724 F.2d 1425, 1430-31
(4th Cir. 1983), cert. denied, 464 U.S. 1065 (1984); and Marzullo
v. Maryland, 561 F.2d 540 (4th Cir. 1977), cert. denied, 435 U.S.
1011 (1978).

Furthermore, in considering the prejudice prong of the
analysis, the Court must not grant relief solely because a peti-
tioner can show that, but for counsel's performance, the outcome
of the proceeding would have been different.  Sexton v. French,
163 F.3d 874, 882 (4th Cir. 1998), cert. denied, 528 U.S. 855
(1999).  Rather, the Court "can only grant relief under . . .
Strickland if the 'result of the proceeding was fundamentally
unfair or unreliable.'" Id., quoting Lockhart v. Fretwell, 506
U.S. 364, 369 (1993).

To put it another way, in order to demonstrate prejudice, a petitioner must show a probability that the alleged errors worked to his "actual and substantial disadvantage, infecting his trial with error of constitutional dimensions." Murray v. Carrier, 477 U.S. 478, 494 (1986), citing United States v. Frady, 456 U.S. 152, 170 (1982).  Under these circumstances, then, the petitioner "bears the burden of proving Strickland prejudice." Fields, 956 F.2d at 1297, citing Hutchins, 724 F.2d at 1430-31.  Therefore, if the petitioner fails to meet this burden, a "reviewing court need not consider the performance prong." Fields, 956 F.2d at 1290, citing Strickland, 466 U.S. at 697.

Turning to the question of whether counsel should have raised an estoppel defense, the law is clear that "[a] criminal defendant may assert an entrapment-by-estoppel defense when the government affirmatively assures him that certain conduct is lawful, the defendant thereafter engages in the conduct in reasonable reliance on those assurances, and a criminal prosecution based upon the conduct ensues." United States v. Marshall, 332 F.3d 254, 262 (4th Cir. 2003); quoting United States v. Aquino-Chacon, 109 F.3d 936, 938-39 (4th Cir. 1997).  The Marshall Court noted that "[t]o assert the defense, a defendant 'must demonstrate that there was active misleading in the sense that the government actually told him that the proscribed conduct was permissible. Id. at 262 (citations omitted).

In the instant case, even assuming that Petitioner can show
that the Chicago authorities permitted him to support himself
with his drug proceeds, that fact is of little consequence in
this case.  Indeed, if Petitioner merely had used those proceeds
to pay for his food, clothing, shelter, travel to and from Chica-
go and, perhaps, a vehicle for his transportation, that would
have been another matter altogether.  That simply was not the
case here.

Rather, the record evidence reflects that Petitioner not
only used his proceeds to support himself, but he also used them
to make numerous automobile purchases -- in his family members'
names -- through which he laundered his drug proceeds.  There-
fore, it was Petitioner's act of committing such money laundering
offenses that resulted in his prosecution in this District.
To put it another way, Petitioner has failed to show that Chicago
authorities "actively misled[]" him into believing that his money
laundering crimes were permissible.

Nor has Petitioner shown that any government official told
him that his money laundering activity was legal.  See, e.g.,
United States v. Clark, 986 F.2d 65, 69 (4th Cir. 1993).  Peti-
tioner has failed to show that he ever was authorized to engage
in the criminal conduct for which he was prosecuted in this
Court; therefore, his "entrapment by estoppel" defense would have
been unavailing.  That being the case, counsel could not have

been ineffective for having failed to raise that argument.

Nor could counsel have been ineffective for having failed to raise a collateral estoppel defense for Petitioner. "For criminal purposes, the doctrine of collateral estoppel derives from the Fifth Amendment's guarantee against double jeopardy." Ashe v. Swenson, 397 U.S. 436, 445 (1970). If applicable, such doctrine would "preclude[] an ultimate factual issue that was necessarily decided in a defendant's favor in an earlier criminal proceeding from being re-litigated against the same defendant. Id. at 445. Thus, "[f]or collateral estoppel to apply in criminal cases, there must have been a prior adjudication, involving the same parties or their privies, in which the same issue was resolved favorably to the accused, either expressly or by necessary implication." United States v. Sutton, 245 F. Supp. 357, 359 (D.C. Md. 1965); see United States v. Fiel, 35 F.3d 997 (4th Cir. 1994) (identifying five elements relevant to collateral estoppel claim/defense, including question of whether matter actually was determined in prior adjudication); and United States v. Goodine, 400 F.3d 202 (4th Cir. 2005) (applying Fiel elements to reject defense that prosecution collaterally was estopped from re-trying defendant on § 922(g) charge gun when he previously was acquitted of § 922(g) charge involving gun's ammunition).

Here, Petitioner has failed to demonstrate that the question of his entitlement to launder his drug proceeds previously was

resolved in his favor by any Court. Therefore, inasmuch as the doctrine of collateral estoppel also would have been unavailing to Petitioner had his former counsel chosen to rely upon it, counsel could not have been ineffective for having chosen not to raise such a defense.

Nor can counsel establish that Petitioner's guilty plea otherwise is invalid. Rather, as the Government accurately has noted, the record of Petitioner's criminal proceedings clearly reflects that he knowingly and freely tendered his guilty plea to this Court. That is, during his Plea Hearing, Petitioner advised the Court, under oath, that he had discussed the charges with his attorney; that he fully understood those charges and the maximum penalties he was facing; that he had spoken with his attorney regarding the Guidelines and how they might have been applied in his case; and that they also had discussed any possible defenses he may have had to the charges. In addition, Petitioner swore to the Court that he was pleading guilty to the subject charge because he, in fact, is guilty of money laundering; and he repeated several of those critical admissions during his Sentencing Hearing.

Habeas counsel also have failed to forecast any evidence to overcome the well settled rule that statements previously made under oath, particularly those made during a Rule 11 proceeding, which affirm an understanding of the proceedings and satisfaction

with counsel, are deemed binding in the absence of "clear and convincing evidence to the contrary." <u>Fields</u>, 956 F.2d at 1299, <u>citing</u> <u>Blackledge v. Allison</u>, 431 U.S. 63, 74-75 (1977). Indeed, such statements "constitute a formidable barrier" to their subsequent attack. <u>Blackledge</u>, 431 U.S. at 73-74. Thus, once a trial court conducts a Rule 11 colloquy and finds that the plea is being knowingly and voluntarily tendered, absent compelling reasons to the contrary, the validity of the plea and a petitioner's corresponding responses are deemed to be conclusively established. <u>Via v. Superintendent, Powhatan Correctional Center</u>, 643 F.2d 167 (4th Cir. 1981).

Furthermore, to the extent that counsel are challenging the sufficiency of the factual basis for Petitioner's guilty plea, that argument also must fail. It is equally well settled that "a guilty plea constitutes a waiver of all nonjurisdictional defects, including the right to contest the factual merits of the charges." <u>United States v. Willis</u>, 992 F.2 489, 490 (4th Cir. 1993). Thus, Petitioner's multiple attacks on the validity of his guilty plea all must fail.

> **B.** **<u>The allegations raised in Petitioner's second consolidated claim also are baseless.</u>**

By their second claim, <u>habeas</u> counsel allege that trial "[c]ounsel was ineffective for failing to challenge the Sentencing Guidelines as applicable to the amount of funds pled to as

the loss value for the money laundering charge." However, this claim also is factually baseless.

To be sure, the record reflects that defense counsel did, in fact, challenge the Court's application of the three-level increase. Thus, <u>habeas</u> counsel simply are wrong in their assertion that no challenge was made.

Concerning that challenge, the record reflects that the Court considered defense counsel's argument that Petitioner could not be subject to the three-level increase, but instead concluded that the increase was applicable because Petitioner had stipulated to amount of the loss in his Plea Agreement. Thus, trial counsel was not deficient as here alleged.

Moreover, to the extent that <u>habeas</u> counsel is re-asserting the crux of the first claim by arguing that trial counsel was ineffective for having failed to argue that the Chicago authorities' approval of Petitioner's use of his drug proceeds precluded this Court's application of any enhancements under § 2S of the U.S. Sentencing Guidelines, that argument also must be rejected. As this Court already has made clear, there simply is no evidence that Petitioner was given permission to launder his drug money. Thus, any arguments which are grounded in such a theory must be rejected.

Further, <u>habeas</u> counsel cannot prevail in their argument that the enhancements were inappropriate because the facts under-

lying them were not proven to a jury beyond a reasonable doubt
. . . ." Rather, it now is abundantly clear that the rule an-
nounced in Apprendi, and further established by its progeny,
Blakely and Booker/ Fanfan, is not applicable in collateral pro-
ceedings such as these.[4]  See United States v. Sanders, 247 F.3d
139 (4th Cir.) (holding that Apprendi is not retroactively appli-
cable to cases which are before the Court on collateral review),
cert. denied, 534 U.S. 1032 (2001); and United States v. Morris,
429 F.3d 65, 72 (4th Cir. 2005) (holding that Booker also is not
retroactively applicable on collateral review).  See also United
States v. Fowler, No. 05-6493, slip op. at 1 (W.Va. June 17,
2005) (holding that "neither Booker nor Blakely announce a new
rule of constitutional law made retroactive by the Supreme Court
to cases on collateral review.").  Thus, even in the absence of
Petitioner's stipulation to the subject enhancement, this claim
must fail.

     Moreover, habeas counsels' argument that Petitioner's en-
hancement constitutes double counting also must fail.  In United
States v. Puckett, 61 F.3d 1092, 1096-97 (4th Cir. 1995), the
Court rejected a claim of double counting and expressly approved
of the application of sentencing enhancements based upon both the
defendant's knowledge that the laundered funds were drug proceeds

---

[4]In his original Motion to Vacate, Petitioner alleges that the offense
level increase violates Blakely; and in his "Supplement To Motion To Vacate
. . . ," Petitioner alleges that the increase also violates Booker.

and the actual amount of those proceeds.  Therefore, this Court
did not engage in any double counting about which trial counsel
could have complained.

As to their last argument in purported support of this
claim--that the three-level increase in Petitioner's offense
level constitutes an _ex post facto_ violation, _habeas_ counsel do
not even bother to identify the unfavorable change to which Peti-
tioner supposedly was subjected.  Therefore, the Court finds that
no further discussion of such _ex post facto_ argument is required.

      **C.**   **Petitioner's claim that counsel was "in-
 effective for failing to address [the fore-
going] matters at the district court and/or
to appeal same" is baseless**.

In support of this claim, _habeas_ counsel allege that trial
counsel was ineffective because counsel allegedly:

> advised the Defendant [sic] not to pursue an
> appeal but failed to notify the Defendant
> [sic] that there was a potential conflict of
> interest because he had failed to protect Peti-
> tioner's rights under the Agreement with the
> Government in Chicago.  Counsel never advised
> the Defendant that he had the right to raise
> ineffective assistance of trial counsel.

However, this disjointed claim, like the previous ones, also must
fail.

First, the Court notes that the foregoing claim does not
allege that Petitioner asked his attorney to file an appeal and
counsel failed to honor that request.  Rather, the above-cited
language merely claims that trial counsel advised Petitioner not

to appeal without having first disclosed certain critical infor-
mation to him. Thus, <u>habeas</u> counsels' argument is tantamount to
a claim that trial counsel was ineffective because he allowed
Petitioner to make a decision about whether or not to appeal
without first having informed him of the facts necessary to make
that decision. However, the two matters which <u>habeas</u> counsel
identify as the critical information actually are non-factors.

That is, there was no agreement with Chicago authorities,
implied or otherwise, which gave Petitioner permission to engage
in money laundering activities. Therefore, Petitioner's decision
not to pursue an appeal could not have been adversely impacted by
counsel's alleged failure to confess the existence of a conflict
of interest created from counsel's alleged failure to have pro-
tected Petitioner's rights under any such agreement.

Similarly, Petitioner's decision concerning whether or not
to pursue an appeal could not have been adversely impacted by
counsel's alleged failure to have advised Petitioner that he had
a right to raise a claim of ineffective assistance of counsel on
appeal. As <u>habeas</u> counsel properly conceded, claims of ineffec-
tive assistance of counsel are "more suited for District Court
determinations." (<u>See</u> "Petitioner's Response To Government's
Reply . . . ," filed December 1, 2004 at p. 5).

Second, while the Court is well aware that Petitioner even-
tually did swear that he made a request for an appeal which was

refused by trial counsel,[5] that belated assertion is of question-able value for at least two reasons.  Notwithstanding the fact that Petitioner's Motion to Vacate was drafted by two <u>habeas</u> attorneys, he did not even allege that he had requested an appeal until <u>after</u> the Government, in its response to his Motion to Vacate, pointed out Petitioner's omission of that critical fact and made clear the consequence of the omission.  Thus, given the timing of Petitioner's allegation, the Court finds that it can put little, if any, confidence in its veracity.[6]

Additionally, the Court is aware that Petitioner was repre-sented by two attorneys during the Sentencing and post-Sentencing stages of his case.  However, Petitioner's claim reflects that he asked only one of the two attorneys to appeal his case.  Thus, for Petitioner to prevail on this claim, this Court would have to ignore the belated timing of his assertion that he requested an appeal <u>and</u> find it reasonable that, although he wanted an appeal,

---

[5]In his Affidavit, filed as Exhibit B to his Reply to the Government's Response, Petitioner makes the somewhat cryptic statement that he "requested an appeal of [his] Chicago case and [he] also requested an appeal in [his] Charlotte case. [His] attorney informed [him] that [he] couldn't file an appeal because the sentences would be run consecutive instead of concurrent."

[6]The veracity of this allegation further is undermined by <u>habeas</u> coun-sel's false claim that "no evidence could be shown that Petitioner was, in fact, dealing drugs . . . . The only thing that became known by Smith's co-operation was that Petitioner had purchased cars from Smith's business with cash left in his possession while cooperating with authorities in Chicago." On the contrary, Petitioner's guilty plea constitutes an admission of his money laundering activities.  Additionally, as was previously noted by this Court, Petitioner confessed to selling a kilogram of cocaine to Smith, but only after that transaction inadvertently was revealed to Charlotte authorities.  Thus, even if the Court were to assume that such transaction was an isolated inci-dent, a highly unlikely proposition, <u>habeas</u> counsels' obvious misrepresen-tation of any of the facts speaks volumes about the strength of their case.

he was content to have directed his request to only one of his two _retained_ attorneys.  Suffice it to say, however, such  findings would be both unreasonable and against the greater weight of the evidence.

### III.  CONCLUSION

The record of this matter reflects that Petitioner has failed to state a claim for relief on any of his allegations against counsel.  Therefore, the Government's Motion for Summary Judgment must be _granted_; and Petitioner's Motion to Vacate must be _denied_ and _dismissed_.

### IV. ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.  The Government's Motion for Summary Judgment (document # 7) is **GRANTED;** and

2.  Petitioner's Motion to Vacate is **DENIED and DISMISSED.**

**SO ORDERED.**

Signed: March 17, 2008

Richard L. Voorhees
United States District Judge

31